467 A.2d 841

**COMMONWEALTH of Pennsylvania**

**v.**

**Robert Lloyd MIDDLETON, Jr., Appellant.**

Superior Court of Pennsylvania.

Argued Feb. 24, 1983.

Filed Oct. 28, 1983.

Petition for Allowance of Appeal Denied Feb. 23, 1984.

*sylvania's Comparative Negligence Statute on Traditional Tort Concepts and Doctrines,* 24 Villanova L.Rev. 453 (1979).

534

536

Nancy S. Schultz, Franklin, for appellant.

William G. Martin, Franklin, for Commonwealth, appellee.

Before SPAETH, BROSKY and MONTEMURO, JJ.

MONTEMURO, Judge:

This is an appeal from the judgment of sentence of the Court of Common Pleas of Venango County entered against the appellant, Robert Lloyd Middleton. Appellant was charged with criminal homicide in connection with the shooting death of Linda Jane Miller. A consolidated jury trial was held for the appellant and a co-defendant, James Hart-

zell, in which the appellant was found guilty of second degree murder.* His motions for a new trial and in arrest of judgment were denied by the trial court and he was sentenced to life imprisonment.

The appellant raises several claims of error herein. First, he attacks the constitutionality of the felony-murder statute on two bases: (1) he argues that the imposition of a sentence of life imprisonment on an accomplice to a felony-murder violates the Eighth Amendment prohibition against cruel and unusual punishment; and (2) he argues that the Commonwealth's ability to establish the requisite state of mind by implication violates due process of law. Second, he contends that the trial court erred in denying his demurrer to the charge of felony-murder. Third, he contends that the trial court erred in admitting evidence of other crimes committed by the appellant and his co-defendant. Finally, he contends that the trial court erred in joining his trial with that of his co-defendant, James Hartzell.

The facts relevant to this appeal are as follows:

On the evening of January 17, 1981, the appellant, Jerry Rice and John Perry drove to the home of James Edward Hartzell to try to sell Hartzell a set of stereo speakers and a .44 magnum handgun which Rice and the appellant had obtained in a burglary earlier. The handgun was loaded and kept in the glove compartment of Rice's automobile. While at the appellant's house they each had a few whiskey and orange juice cocktails and discussed driving into Oil City to "rob drunks". They also discussed going to Rouse-ville to rob one Carrie Schilk, a cousin of Hartzell. Rice, Hartzell, Perry and the appellant left the Hartzells' home at approximately 10:30 to 11:00 P.M. They were all in Rice's automobile. Perry was dropped off at his house in Pin Oak Village and the others proceeded to Oil City.

Once there, Rice parked the vehicle. The three men went to a bar called "Scrubby's". Hartzell and the appellant stayed and had a drink. Rice left because he was underage

---

* Co-defendant, James Hartzell, was found to be guilty of first-degree murder.

and the barmaid refused to serve him. Rice went out to the street and waited for a victim. Rice soon became cold and returned to his automobile where he was met by Hartzell and the appellant. It was approximately 1:00 A.M.

It was at this time the criminal activity, later described by some as a "crime spree", began. Rice saw a man who was carrying several cartons leaving a nearby bar. The man got into his car. After some discussion among the felons, Rice exited the vehicle with the gun and walked over to the car and knocked on the window. The man, one William Gesin, opened the window whereupon Rice produced the pistol and demanded Gesin's wallet. Rice took the proffered wallet and told Gesin to drive straight over the hill. He then returned to the car where the proceeds of the crime were divided.

The three men then decided to leave and re-enter Oil City as an evasive maneuver to escape detection for the Gesin robbery. Rice was driving, the appellant was in the front passenger seat and Hartzell was sitting behind the appellant in the rear seat. The gun was on an arm rest between Rice and the appellant. They drove a few miles out of town and then returned to Oil City, with their ultimate destination being Rouseville. They stopped on the roadside across from the Oasis Bar so that Rice and Hartzell could urinate.

At that unfortunate moment, Linda Jane Miller walked out of the Oasis Bar and toward her pick-up truck in the parking lot. After some discussion among the three men, the appellant retrieved the handgun from the car and walked across the street for the purpose of robbing Linda Miller. Hartzell said to the appellant words to the effect "if she was ugly to blow her away." The appellant followed Miller to her truck; however, she reached the truck and drove away before he could consummate the crime.

The appellant returned to the car and, again after some discussion, the three men decided to follow her to her home and rob her there. They did, in fact, follow her toward Rouseville. Rice wanted to pass Miller because the truck was weaving back and forth across the road. Hartzell said

to Rice "this is a good road for it." He also instructed Rice as to the exact moment to pass.

As Rice passed the truck he heard a shot from the back seat. Hartzell said that he thought he got her. They continued up the road for about three-quarters of a mile, turned around and returned to where Miller's truck had crashed into a ditch. The appellant got out of the car and talked to another motorist who had stopped to investigate. The appellant said he would call the police. Miller was not visible in the truck, probably because she had slumped to the floor. The men then left and proceeded to Rouseville.

Hartzell gave directions to Rice leading to the home of Carrie Schilk, Hartzell's cousin. Rice's testimony indicates that during the entire time subsequent to the shooting of Miller, the gun was in Hartzell's possession. At Schilk's house, Rice and the appellant went to the door while Hartzell waited around the corner of the house. Schilk opened the door, and the appellant and Rice grabbed her and turned her around. Hartzell entered and hit her on the head with the butt of the handgun. The force of the blow shattered the pistol grips. They proceeded to rob Schilk of money and personal items, and then left. The appellant also took Schilk's pick-up truck.

Subsequent to the Schilk robbery, the appellant abandoned the truck and the three men went to a restaurant called the Villa Italia. At trial the night manager, Charles Latchaw, identified all three men as being present at the restaurant at approximately 4:00 A.M. After eating, the men left, split up the stolen items and then returned to their respective homes.

Later that morning, Rice surrendered to the police and gave them a statement implicating Hartzell and the appellant. He also directed the police to where the pistol and wallet had been discarded.

Hartzell raised an alibi defense. He testified that he had been with Rice and the appellant for part of the night but that they dropped him off at home at approximately 1:30

A.M. Hartzell's wife testified that Hartzell was home at 1:30 A.M. The jury discredited this alibi testimony.

The appellant offered no testimony in his own defense.

Turning to the appellant's arguments, we begin with an examination of his attack on the constitutionality of the felony-murder statute. 18 Pa.C.S.A. § 2502(b). The appellant's assault is two-pronged. First, he asserts that his conviction under the felony-murder statute violates due process of law guaranteed by the United States Constitution,[1] and the Pennsylvania Constitution.[2] The thrust of the appellant's argument is that he has been deprived of due process by virtue of the Commonwealth's ability to establish the prerequisite state of mind (malice) by implication; i.e., that the malice is established by the intent to commit the initial felony.

■ Our examination of the record reveals that the appellant failed to include this issue in his post-verdict motions as required by Pa.R.Crim.P. 1123(a). Consequently, this issue is waived for purposes of appellate review.[3] *Commonwealth v. Waters*, 477 Pa. 430, 384 A.2d 234 (1978); *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975). Appellant asserts in a footnote that the above issue was preserved within a general claim of the insufficiency of the evidence included in his post-verdict motions. We reject this contention.[4]

1. United States Constitution, Amendments IV, XIV.

2. Pennsylvania Constitution, Article I, Section 9.

3. Even if we were to decide this issue on its merits, past precedents would mandate a result adverse to the appellant. See *Commonwealth v. Cornish*, 471 Pa. 256, 370 A.2d 291 (1977); *Commonwealth v. Yuknavich*, 448 Pa. 502, 295 A.2d 290 (1972); *Commonwealth ex rel. Smith v. Myers*, 438 Pa. 218, 261 A.2d 550 (1970). In each of these cases, the supreme court upheld the constitutional validity of the felony-murder statute. Cf. *Commonwealth v. Geiger*, 475 Pa. 249, 380 A.2d 338 (1977).

4. Appellant cites *Commonwealth v. Legg*, 491 Pa. 78, 81 n. 1, 417 A.2d 1152, 1154 n. 1 (1980), in support of his claim that the issue is preserved. In *Legg*, the supreme court reviewed the appellant's claim that the evidence was insufficient to sustain a conviction of second

■ The second prong of the appellant's attack on the felony-murder statute is an assertion that the imposition of a mandatory life sentence on one convicted of felony-murder constitutes cruel and unusual punishment in derogation of the Eighth and Fourteenth Amendments to the United States Constitution.[5]

■ The appellant argues that the mandatory life sentence required by 18 Pa.C.S.A. § 1102(b) is unconstitutional because it does not allow the sentencing judge to consider any mitigating factors which might alleviate the sentence; factors such as the defendant's level of participation in the killing and his intent. The appellant seeks to buttress this argument by drawing an analogy to the recent decision of the United States Supreme Court in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and to the Sentencing Code, 42 Pa.C.S.A. § 9701, *et seq.;* both of which require consideration of mitigating and aggravating factors prior to the imposition of the death penalty.

The appellant's argument was specifically addressed, and rejected, in *Commonwealth v. Cornish, supra* 471 Pa. at 261, 370 A.2d at 293, in which the court stated: "It can

degree murder, and a claim that the jury instructions were prejudicial. The court reversed on the latter issue, noting that while both issues were raised separately in post-verdict motions, they were consolidated in the appellate argument; yet the court found the issue presented in a sufficiently clear manner so as to enable review. In the present case, *no* post-verdict motion was filed on this issue and therefore it is waived.

**5.** Unlike the appellant's due process argument, this issue has not been waived because it is essentially an attack on the legality of the sentence. This issue normally must be addressed in the first instance to the trial court by means of a motion for modification of sentence. Pa.R.Crim.P. 1400. *Commonwealth v. McKenna*, 476 Pa. 428, 433, 383 A.2d 1174, 1179–80 (1978); *Commonwealth v. Koziel*, 289 Pa.Super. 22, 432 A.2d 1031 (1981). However, the trial judge must inform the defendant of his opportunity to file a motion challenging the propriety of the sentence. Pa.R.Crim.P. 1405(c)(2). Our review of the sentencing transcript reveals that the trial judge failed to inform the appellant of that right. Consequently, this issue has not been waived. *Commonwealth v. Aldinger*, 292 Pa.Super. 149, 436 A.2d 1196 (1981); *Commonwealth v. Stufflet*, 291 Pa.Super. 516, 436 A.2d 235 (1981); *Commonwealth v. Walton*, 289 Pa.Super. 411, 433 A.2d 517 (1981).

hardly be said that the circumstances wherein a murder is committed during the commission of a felony vary to such an extent that the legislative determination to mandate one penalty is unreasonable." [6]

■ Furthermore, the selection of the penalty of life imprisonment, being a legislative determination, carries a strong presumption of validity, and of constitutionality. *Snider v. Thornburgh*, 496 Pa. 159, 436 A.2d 593 (1981); *School District of Deer Lakes v. Kane*, 463 Pa. 554, 345 A.2d 658 (1975). "Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. * * * a heavy burden rests on those who would attack the judgment of the representatives of the people." *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 59, 454 A.2d 937, 960 (1982) (quoting from *Commonwealth v. Story*, 497 Pa. 273 at 297–98, 440 A.2d 488 at 500–01 (1982) (Larsen, J. dissenting)); *Commonwealth v. Dessus, supra; Commonwealth v. Bryant, supra.*

■ The appellant's argument does not meet this heavy burden. Both the analogy to *Enmund,* and the analogy to the Sentencing Code 42 Pa.C.S.A. § 9711 suffer from the same defect. Both are concerned with the constitutional limitations on the imposition of the death penalty. The appellant would have us overlook the inherent quality of the death penalty which distinguishes it from all other forms of punishment. As stated by the Supreme Court in *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), in holding that a sentencing court must consider the character of the defendant and the circumstances of the offense before the death penalty may be imposed:

> This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality,

---

**6.** See also *Commonwealth v. Sourbeer*, 492 Pa. 17, 422 A.2d 116 (1980); *Commonwealth v. Dessus*, 262 Pa.Super. 443, 396 A.2d 1254 (1978); *Commonwealth v. Bryant*, 239 Pa.Super. 43, 361 A.2d 350 (1976). Cf. *Commonwealth v. Legg, supra.*

differs more from life imprisonment than a 100-year term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 304–305, 96 S.Ct. at 2991–92, 49 L.Ed.2d at 961. See also *Solem v. Helm*, 463 U.S. 277, ——, 103 S.Ct. 3001, 3008, 77 L.Ed.2d 637 (1983); *Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346, 388 (1972) (Stewart, J. concurring); *Commonwealth v. McKenna, supra* 476 Pa. at 428, 383 A.2d at 181; *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977) *cert. denied Pennsylvania v. Moody*, 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978). "As a result [the Court's] decisions in capital cases are of limited assistance in deciding the constitutionality of the punishment' in a noncapital case." *Solem v. Helm, supra* 463 U.S. at ——, 103 S.Ct. at 3010 quoting *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S.Ct. 1133, 1138, 63 L.Ed.2d 382 (1980).

■ Instead we look to *Solem*, in which the Court propounded an analysis by which the courts are to determine whether a sentence is unconstitutionally disproportionate. The analysis relies on a comparison of the sentence to three objective criteria. These are "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Id.* 463 U.S. at ——, 103 S.Ct. at 3010. Application of these criteria herein favors the imposition of the sentence of life imprisonment.

■ The offense of felony-murder is undoubtedly one of the gravest and most serious which can be committed. The taking of a life during the commission of an enumerated felony demonstrates a disregard for the property, safety, sanctity, integrity, and especially, the life of the victim. It is a crime of archviolence. Clearly, such an offense merits a severe penalty.

In comparing the sentence imposed on a felony-murder with those imposed on other criminals in this Commonwealth, we note that 18 P.S. § 1102(a) provides that a person convicted of murder in the first degree may be sentenced to either life imprisonment or death, subject to the provisions of 42 Pa.C.S.A. § 9701, *et seq.* This is the only offense for which the death penalty can be imposed, and the only other offense besides second degree murder for which life imprisonment can be imposed. Felonies of the first degree (e.g. third degree murder, kidnapping, rape, involuntary deviate sexual intercourse, arson, burglary, robbery) are punishable by a term of imprisonment not to exceed 20 years. 18 Pa.C.S.A. § 1103(1). Felonies of the second degree (e.g. voluntary manslaughter, aggravated assault, statutory rape) are punishable by a term of imprisonment not to exceed 10 years. 18 Pa.C.S.A. § 1103(2). Felonies of the third degree are punishable by a term of imprisonment not to exceed 7 years. 18 Pa.C.S.A. § 1103(3). It is clear that the legislature contemplated that the seriousness of second degree murder—that is, murder in the course of a first degree felony—should be matched by an equally severe penalty.

Finally, we compare the sentences imposed for commission of the same crime in other jurisdiction. Fortunately this lengthy compilation has been performed for us by the Supreme Court in *Enmund, supra,* 458 U.S. at 795, 102 S.Ct. at 3376. It is shown therein that a sentence of life imprisonment for felony-murder comports with the range of sentences found proper in other jurisdictions.

We conclude that the consideration of the three criteria set forth in *Solem* does not derogate from the propriety of a sentence of life imprisonment for the offense of second degree murder.

■■■ The appellant next argues that the trial court erred in denying his demurrer to the charge of felony-murder. "The test to be applied in ruling on a demurrer is whether the evidence and all reasonable inferences therefrom are sufficient to support a finding by the jury that the defend-

ant was guilty beyond a reasonable doubt." *Commonwealth v. Duncan*, 473 Pa. 62, 66, 373 A.2d 1051, 1053 (1977); *Commonwealth v. Long*, 467 Pa. 98, 354 A.2d 569 (1976).

 The appellant argues that the killing was not connected to the attempted robbery of Linda Jane Miller, and therefore, the demurrer should have been granted because the slaying was not in furtherance of the underlying felony. *In Commonwealth v. Waters*, 491 Pa. 85, 95, 418 A.2d 312, 317 (1980), the court discussed the elements to be proved in order to establish accomplice liability for felony murder, saying that:

... [t]he responsibility of persons, other than the slayer, for a homicide committed in the perpetration of a felony require[s] proof of a conspiratorial design by the slayer and the others to commit the underlying felony *and* of an act by the slayer causing death which was in furtherance of the felony. See e.g. *Commonwealth v. Allen* [475 Pa. 165, 379 A.2d 1335], *supra; Commonwealth v. Banks*, 454 Pa. 401, 311 A.2d 576 (1973); *Commonwealth v. Williams*, 443 Pa. 85, 277 A.2d 781 (1971); *Commonwealth v. Redline*, 391 Pa. 486, 137 A.2d 472 (1958). *Cf. Commonwealth v. Schwartz*, 445 Pa. 515, 285 A.2d 154 (1971). (footnote omitted) (emphasis in original).

Moreover, it was stated by the court in *Commonwealth v. Legg, supra* 491 Pa. at 82, 417 A.2d at 1154:

When an actor engages in one of the statutorily enumerated felonies and a killing occurs, the law, via the felony-murder rule, allows the finder of fact to infer the killing was malicious from the fact the actor was engaged in a felony of such a dangerous nature to human life because the actor, as held to the standard of a reasonable man, knew or should have known that death might result from the felony. (footnote omitted)

After applying these standards, we conclude that the trial court properly denied the appellant's demurrer because the evidence was sufficient to establish the appellant's guilt beyond a reasonable doubt.

■ The evidence shows that the appellant, and his co-felons on the night in question, embarked on a plan to "rob drunks." One robbery, that of William Gesin, had already been consummated; another, that of Linda Jane Miller, the victim, was attempted by the appellant. After Miller drove away in her truck, the three men agreed to follow her for the purpose of robbing her. Hartzell said to appellant, "If she's ugly, blow her away." Miller was shot when the vehicle in which the felons were driving passed Miller's vehicle and Hartzell fired one shot from the rear seat.

■ There can be no doubt that there was a conspiratorial design to commit the underlying felony—the robbery of Miller—of which the appellant was a part. The appellant was the actor in the initial attempt; he carried the gun used in that attempt; and after the attempt was temporarily thwarted, he engaged in the discussion of continuing the robbery and accompanied the others for that purpose. The act by Hartzell which caused the death of Miller was in furtherance of the felony. The felons were following her for the purpose of robbing her—with force if necessary. One of them took matters into his own hands to force prematurely the intended result. The question of whether this act was in "furtherance of the conspiracy was a question of proof for the jury to resolve." *Commonwealth v. McNeal*, 456 Pa. 394, 396–97, 319 A.2d 669, 671 (1974). It does not matter whether the appellant anticipated that the victim would be killed in furtherance of the conspiracy. *Id.*, 456 Pa. at 397, 319 A.2d at 672. The appellant knew or should have known that the possibility of death accompanied this dangerous undertaking. *Commonwealth v. Legg, supra; Commonwealth v. Martin*, 465 Pa. 134, 348 A.2d 391 (1975) *cert.* denied *Pennsylvania v. Martin*, 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976); *Commonwealth v. Yuknavich, supra.* Thus, this claim must also fail.

Appellant's third claim is that the trial court erred in allowing the admission of evidence of other crimes committed by the appellant and his co-felons. Specifically, the appellant would have us find error in the admission of

testimony regarding the robbery of William Gesin; the prior attempted robbery of Linda Jane Miller; the robbery of Carrie Schilk; and the theft of a truck from the Schilk residence. We decline to do so.

■ Our scope of review in this matter is whether the trial court abused its discretion in allowing the admission of the other crimes evidence. *Commonwealth v. Ulatoski,* 472 Pa. 53, 371 A.2d 186 (1977).

The general rule, of course, prohibits testimony regarding other criminal acts. However, the exceptions under which such testimony is admissible are well established. Included are those cases where the evidence is introduced to prove: (1) motive; (2) intent; (3) absence of mistake or accident; (4) a scheme, plan or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the other; or (5) the identity of the person charged with the commission of the crime on trial. *Commonwealth v. Peterson,* 453 Pa. 187, 307 A.2d 264 (1973); *Commonwealth v. Booth,* 291 Pa.Super. 278, 435 A.2d 1220 (1981).

■ Additionally, the probative value of the evidence must exceed its prejudicial impact. *Commonwealth v. Ulatoski, supra; Commonwealth v. Hawkins,* 295 Pa.Super. 429, 441 A.2d 1308 (1982); *Commonwealth v. King,* 290 Pa.Super. 563, 434 A.2d 1294 (1981); *Commonwealth v. Hude,* 256 Pa.Super. 439, 390 A.2d 183 (1978).

After analyzing the appellant's claim under the above standard we conclude the trial court did not abuse its discretion in admitting the contested testimony.

■ The Commonwealth's testimony showed that the three actors herein formulated a plan to "rob drunks" while they were at the Hartzell's house. The armed robbery of William Gesin was but one manifestation of this preconceived plan. The attempted robbery of Linda Jane Miller was another. In both crimes, a similar method was utilized. The men were together in or around Rice's car. When a victim was spotted, one member of the group was selected

to carry out the robbery. The same weapon was used in each criminal episode. The crimes occurred within one hour of each other, and took place within a few miles of each other. In both crimes there was a possibility, because of the use of a deadly weapon, of the escalation into violence, including serious injury or death. The fact that only one of the crimes resulted in such an escalation is not a sufficient distinction between them so as to preclude the application of the common scheme exception.

█ Furthermore, we refuse to accept the purported distinction between the "attempted robbery" of Miller and the subsequent "attempt" which resulted in her murder. We are of the view that this scenario constituted a single criminal episode; a single attempt encompassing a temporary setback in its perpetration. Therefore there was no error in the admission of testimony regarding the criminal act since it was part and parcel of the underlying felony upon which the charge of second degree murder was premised. Thus, it was also admissible to demonstrate the appellant's intent to engage in the underlying felony. Finally, the probative value of this testimony clearly outweighs any prejudicial impact it might have.

█ The testimony concerning the robbery of Carrie Schilk also shows that it arose out of the plan formulated by the men while at Hartzell's house. Again the crime took place close in time and space to the slaying of Miller; and again the same weapon was used in both crimes. While these factors may not be sufficiently identical to meet the threshold for the common scheme, plan or design exception, we conclude that the testimony regarding the Schilk robbery (as well as the Gesin robbery) is admissible under the intent or state of mind exception. Because the testimony is relevant to events close in time and place to the shooting of Linda Jane Miller, it tends to demonstrate the appellant's criminal intent with regard to the shooting. Moreover, the testimony shows the appellant's continued association with Hartzell and Rice and participation in further criminal acts that evening. As such it tends to rebut the appellant's

assertion that he lacked the necessary state of mind to establish second degree murder under 18 Pa.C.S.A. § 2502. *Commonwealth v. Murphy,* 493 Pa. 35, 425 A.2d 352 (1981). Finally, we agree with the trial court that the theft of Schilk's pick-up truck was part of the robbery, and thus, admissible under the same analysis.

Appellant's final contention is that the trial court erred in granting the Commonwealth's motion to consolidate the trials of the appellant and co-defendant, James Hartzell. Specifically, he contends that he was prejudiced by the introduction of evidence admissible against Hartzell, but not against himself; that he was prejudiced by the questionable credibility of Hartzell's alibi testimony; and that he was prejudiced by the testimony of two witnesses, Paul Eiseman and Al Dempsey, who were called for the purpose of impeaching the testimony of Jerry Rice.

In *Commonwealth v. Tolassi,* 489 Pa. 41, 413 A.2d 1003 (1980), the supreme court held that:

> The decision whether to sever cases against co-defendants is one within the sound discretion of the trial court. *Commonwealth v. Kloiber,* 378 Pa. 412, 106 A.2d 820 (1954), *cert. denied,* 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954); Pa.R.Crim.P. 219. Such a decision will be reviewed only where there has been a manifest abuse of discretion. *Commonwealth v. Lasch,* 464 Pa. 573, 347 A.2d 690 (1975) (opinion in support of affirmance); *Commonwealth v. Patrick,* 416 Pa. 437, 206 A.2d 295, (1965) appeal after remand 424 Pa. 380, 227 A.2d 849 (1967). And the critical factor in one analysis is the prejudice which inures to the accused as a result of the trial court's determination. *Commonwealth v. Peterson,* 453 Pa. 187, 194, 307 A.2d 264, 267 (1973); *Commonwealth v. Lasch, supra,* 464 Pa. at 584–85, 347 A.2d at 690.

*Id.* 489 Pa. at 49, 413 A.2d at 1007; *Commonwealth v. Scarborough,* 313 Pa.Super. 521, 460 A.2d 310 (1983).

We find no abuse of discretion in the trial court's decision. First, we see no prejudice to the appellant in the admission of the other crimes testimony because, as we

have already held, the evidence was admissible against the appellant as well as against Hartzell. Second, we do not see how the lack of credibility of Hartzell's alibi witness operates to the detriment of the appellant. Finally, we conclude that the appellant was not prejudiced by the testimony of Eiseman and Dempsey. Their testimony was introduced solely to impeach the testimony of Jerry Rice. The trial judge carefully issued a cautionary instruction to the jury on that point. Furthermore, the trial judge obviated the potential prejudice of the testimony—a finding of guilt of murder in the first degree—by granting the appellant's demurrer to this charge. Thus we find no prejudice and no error on the part of the trial court.

Accordingly the judgment of sentence is affirmed.