J. A34008/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| SHANE SHAQUILL HOLLOWAY, | : | No. 820 MDA 2014 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, April 9, 2014,
in the Court of Common Pleas of Dauphin County
Criminal Division at No. CP-22-CR-0002479-2013

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN AND STABILE, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED MARCH 23, 2015**

The instant prosecution stemmed from the fatal shooting of Courtney

Jackson. Following a jury trial, appellant was convicted of second degree

murder, 18 Pa.C.S.A. § 2502(b), robbery, 18 Pa.C.S.A. § 3701(a)(1)(i),

firearms not to be carried without a license, 18 Pa.C.S.A. § 6106(a)(1), and

tampering with physical evidence, 18 Pa.C.S.A. § 4910(1).[1] Herein,

appellant appeals from the judgment of sentence entered on April 9, 2014.

We affirm.

Illiana Luciano ("Luciano") was dating Jackson ("the victim"). On

March 4, 2013, the two spent time together until approximately 5:00 p.m.

(Notes of testimony, 3/24/14 at 69-71.) At this time, Luciano drove the

---

[1] Counts of conspiracy and furnishing false reports to authorities were
withdrawn by the Commonwealth.

victim around the corner to the Turkey Hill store where he was to meet with an acquaintance known as "Layton." (*Id.* at 72.) Luciano did not communicate with the victim again until approximately 6:30 p.m. when the store clerk at the B & W Corner Store notified her that the victim had purchased something in the store but never came to retrieve it. (*Id.* at 77.)

Wayne Cameron ("Cameron") testified to his observations of the events on March 4, 2013. At 8:00 p.m., Cameron was outside of his home near the B & W Corner Store when he discovered a young man, later identified as the victim, lying face down in the alleyway. (*Id.* at 91.) Cameron approached and found the victim covered in blood and saw foam coming from his mouth. He found that the victim did not have a pulse. Cameron explained that the victim's body was outstretched as if he was running with both hands extended from his body. (*Id.* at 91, 95.) The victim was holding a cell phone in one of his hands that was ringing repeatedly, and a picture of a woman continued to appear on the screen as the phone rang. (*Id.* at 96-97.)

The police investigated and recovered fired shell casings from a .40 caliber and a .25 caliber gun. Dr. Wayne Ross performed an autopsy and also examined the crime scene photos. (Notes of testimony, 3/25/14 Vol. I at 57-58.) The victim had been shot several times in the chest, his arm, and his back. (*Id.* at 61.) When the clothing was removed from his body, Ross observed eight gunshot wounds -- four were to the left arm,

three to the left side of his chest, and one to his back. (*Id.* at 71.) Three of the gunshot wounds were fatal with two being made by the .25 caliber bullet. Based on gunpowder residue, Dr. Ross testified that he was shot at a distance of greater than four feet away from the .40 caliber gun and two to three feet away from the .25 caliber gun. (*Id.* at 69-70.) Dr. Ross determined that the body had to have been face down prior to being face up at the crime scene due to the foliage and soil on his body. (*Id.* at 60.) A .40 caliber bullet was recovered at the scene from beneath the victim's T-shirt.

Layton Potter, a friend of the victim's, testified to the events of March 4, 2013. (Notes of testimony, 3/25/14 Vol. II at 4.) Potter explained that the victim used to sell marijuana and cocaine to him. (*Id.* at 5-6.) On March 4, 2013, Potter had placed a call between 1:00 p.m. and 3:00 p.m. to the victim that he wanted to buy drugs. (*Id.* at 6-7.) The plan was for Potter to pick up the victim at the Turkey Hill Store and drive him to 19th and North Street where the victim gave cocaine to Potter. (*Id.* at 8.) Potter then drove home to smoke the drugs at his house. Later that evening, Potter wanted to buy more cocaine and called the victim again at 7:00 p.m. The men agreed to meet at North Street across from the B & W Corner Store. The exchange took place in Potter's car. (*Id.*)

The men then went into the store, and Potter saw appellant with Tyya Barnes across the street. Potter observed appellant and Barnes

"huddling," which is street terminology for leaning in towards each other and conversing quietly; he also observed them making hand gestures. (*Id.* at 10, 15-18.) The victim indicated that he was going to conduct a drug transaction with appellant and Barnes. (*Id.* at 19.) The victim then took Potter home, and that was the last time Potter saw him alive.

Detective Jeffrey Schriver responded to the scene following an emergency call reporting what had happened in the alley. Upon arrival, he noticed Jackson's cell phone ringing and copied the incoming phone numbers that appeared on the screen. (Notes of testimony, 3/25-26/14 Vol. III at 48.) The last call that was received and answered by Jackson was from a number which belonged to Barnes.

On March 6, 2013, Detective Schriver conducted a voluntary interview with appellant at the Harrisburg police station. (*Id.* at 50-53.) During the interview, appellant stated that on March 4, 2013, he was not at the location where the victim was shot and killed. Appellant stated that he learned about the victim's death via Facebook.

On March 8, 2013, Detective Joseph A. Zimmerman conducted a second interview with appellant and recorded his statements. (*Id.* at 110.) Appellant was brought to the police department for a non-custodial interrogation; at this point, appellant was considered a person of interest but not a suspect. (*Id.* at 112-113.) Detective Zimmerman met appellant in the interview room with Detective Schriver and stated that the interview sas

going to be non-custodial and that appellant was free to leave anytime. In an abundance of caution, Detective Zimmerman also gave appellant his *Miranda*[2] rights orally and in writing, which he signed. (*Id.* at 114.)

During this recorded statement, appellant admitted that Barnes made a phone call to the victim to arrange a meeting at 7:00 p.m. at 19th and North Street. (*Id.* at 131.) The men met the victim and then proceeded to Barnes' car, which was parked in a dark alleyway several blocks away, so the victim could use his scale. (*Id.* at 132.) Appellant averred that while the victim was trying to weigh the drugs in the backseat, Barnes opened fire using two different caliber firearms which were in the car. (*Id.*) Appellant noted that one of the guns sounded louder than the other. Appellant explained that he heard more shots fired from the softer-sounding gun. (*Id.* at 139.) Appellant alleged that he ducked down and did not see what part of the victim's body had been shot. (*Id.* at 140.) When asked what happened to the shell casings in the car, appellant said that he picked them up and explained "we flushed them down the toilet" at appellant's house. (*Id.* at 132-133.) Appellant averred that Barnes was in possession of his two guns and the victim's gun.

Appellant initially stated that he pulled the victim out of the car and laid him on the ground. (*Id.*) Appellant stated he was unsure as to whether Barnes took any drugs that had been left in the vehicle. (*Id.* at 134.)

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

However, appellant began to change his statement when Detective Zimmerman indicated that the autopsy report concluded the victim was shot outside of the vehicle. (*Id.* at 141.) Appellant then stated that the victim had a gun, so Barnes got out of the car and shot the victim while appellant was pulling the victim out of the car. (*Id.* at 141.) When appellant was pulling the victim out of the car, Barnes fired the last shot into the victim. The victim's gun then fell onto the ground, and appellant picked it up and gave it to Barnes. (*Id.*) Appellant also stated that he picked up the casings from the interior of the car. (*Id.* at 142.)

Cell phone records established that Barnes called the victim three times. Appellant stated that during the calls, Barnes, appellant, and the victim discussed obtaining scales to weigh the drugs. Store surveillance footage introduced at trial showed the victim purchasing a scale from a convenience store in Harrisburg. Appellant stated that Barnes was buying the drugs, and he denied knowing how much Barnes had planned to buy. (*Id.* at 144.) Appellant averred that the men had never talked about a plan to rob the victim. (*Id.*)

Appellant's girlfriend, Emily Latshaw, testified that appellant and Barnes both asked her to lie to the police after the victim was killed; Latshaw admitted that she initially lied when talking to the police. (*Id.* at 33-35, 43.) Latshaw, who lived with appellant, also testified that she

observed a disruption in their routine after the victim was killed. (*Id.* at 36-37.)

Appellant was charged with the aforementioned crimes. Prior to trial, appellant filed a motion to suppress the statements made to the police on March 8, 2013. A hearing was held on March 20, 2014, and the trial court denied the motion on March 21, 2014. On March 24, 2014, a jury trial commenced, and on March 27, 2014, appellant was found guilty of the aforementioned crimes. On April 9, 2014, appellant was sentenced as follows: count 1 (second degree murder) life imprisonment; count 2 (robbery) merged with count 1, count 4 (carrying a firearm without a license) two to five years' incarceration, concurrent to count 1; count 5 (tampering with evidence) six months to two years' incarceration, concurrent with count 1. A timely notice of appeal was filed on May 9, 2014. Appellant filed a concise statement of errors complained of on appeal on July 7, 2014; the trial court has not filed an opinion.

The following issues have been presented for our review:

> I. Whether the trial court committed a fundamental error of law where it erroneously instructed the jury that an accessory after the fact may be liable as an accomplice where such instruction misled and confused the jury, and prejudiced Appellant as the charge permitted a finding of guilt without requiring the Commonwealth to establish the critical elements of accomplice liability beyond a reasonable doubt?

II. Whether the Commonwealth failed to present sufficient evidence to sustain Appellant's convictions for: murder and robbery where the Commonwealth failed to prove that Appellant possessed specific intent for the crime of robbery, and; carrying a firearm without a license and tampering with evidence where the Commonwealth failed to prove that Appellant was the individual who committed the crimes in question?

III. Whether the trial court erred in failing to suppress Appellant's statements where Appellant invoked his right to silence but was denied his right to silence in violation of Article I, Section 9 of the Pennsylvania Constitution and the Fifth Amendment to the United States Constitution?

Appellant's brief at 8.

Appellant first submits that the trial court erroneously instructed the jury. Our standard of review in assessing a trial court's jury instructions is as follows:

> [W]hen evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

***Commonwealth v. Antidormi***, 84 A.3d 736, 754 (Pa.Super. 2014).

Appellant directs us to the following portion of the trial court's instruction:

> You may find that the Defendant is an accomplice in a case if the following two elements are established beyond a reasonable doubt: The first one is that the Defendant had the intent to promote or facilitate the commission of the crime . . . . The second element is that the Defendant solicits, commands, encourages, [sic] requests the other person to commit it, or aids or agrees to aid or attempts to aid the other person in the planning of the crime, the committing of it, or even the exiting or afterwards.

Notes of testimony, 3/27/14 at 14-15.

Relying on **Commonwealth v. McCleary**, 381 A.2d 434 (Pa. 1977), appellant argues that a jury instruction for accomplice liability for second degree murder is improper when the defendant is an accessory after the fact. We find **McCleary** to be easily distinguishable. In **McCleary**, the defendant and his cohort planned to burglarize the home of an elderly woman, or else obtain money by a ruse. **Id.** at 435. However, only after his cohort exited the vehicle carrying a tire iron did the defendant realize that force was going to be used. **Id.** Almost immediately thereafter, the defendant left the area. **Id.** The defendant's cohort broke into the woman's home and killed her with the tire iron. **Id.** Later, the defendant and another person returned and picked up the cohort; however, the defendant did not actually learn of the homicide until sometime thereafter.

Our supreme court held that the trial court erroneously instructed the jury so that "a reasonable understanding of the jury could have been that

aid only in the flight of the felon would make an accomplice guilty of a prior murder of which the accomplice knew nothing." *Id.* at 436. The *McCleary* court explained:

> Flight might be part of a felony for a given statutory purpose, i.e., a killing during flight can be considered as a killing during the commission of a felony. That does not mean that one who only aids flight without participating in the felony plan and without knowledge of a death in the commission of the felony can be held responsible for the killing.

*Id.*

Instantly, appellant was well aware of Barnes' shooting of the victim. In his statement to the detectives, appellant admitted he was with Barnes the entire time and stated Barnes shot the victim multiple times. In fact, appellant was holding the victim as Barnes fired the last shot. Therefore, *McCleary* is wholly inapposite as appellant actively participated in the underlying offense. Appellant's involvement went well beyond just providing a means of escape for Barnes.

Appellant also suggests that the court's instruction allowed the jury to unlawfully convict him even if it believed that appellant only learned of Barnes' plan to kill the victim after the fact. (Appellant's brief at 18.) However, appellant could still be found guilty as an accomplice where the killing was done in furtherance of the predicate felony. The statute defining second degree murder does not require that a homicide be foreseeable; rather, it is only necessary that the accused engaged in conduct as a

principal or an accomplice in the perpetration of a felony. Whether evidence sufficiently indicates that a killing was in furtherance of a predicate felony can be a difficult question. *Commonwealth v. Laudenberger*, 715 A.2d 1156, 1160 (Pa.Super 1998). The question of whether the killing was in furtherance of the conspiracy is a question of proof for the jury to resolve. *Commonwealth v. Middleton*, 467 A.2d 841, 848 (Pa.Super. 1983). It does not matter whether the appellant anticipated that the victim would be killed in furtherance of the conspiracy. *Id.* Rather, the fact-finder determines whether the appellant knew or should have known that the possibility of death accompanied a dangerous undertaking. *Id.* No relief is due.

Next, appellant contends the evidence was insufficient to support his convictions as the Commonwealth established no more than his presence at the scene. Appellant argues that, at most, the evidence established his intent to purchase drugs from the victim. (Appellant's brief at 19, 22-23.) Based on the evidence viewed in the light most favorable to the Commonwealth, we disagree.

In reviewing a sufficiency challenge, we apply the following well-settled principles:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above

- 11 -

> test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown*, 23 A.3d 544, 559-560 (Pa.Super. 2011) (*en banc*), quoting *Commonwealth v. Hutchinson*, 947 A.2d 800, 805 (Pa.Super. 2008), *appeal denied*, 980 A.2d 606 (Pa. 2009)

A defendant commits second-degree murder when he is a principal, accomplice, or co-conspirator to a statutorily-enumerated felony and a person is killed in the course of that felony's commission. 18 Pa.C.S.A. § 2502(b); *Commonwealth v. Knox*, 50 A.3d 732, 739 (Pa.Super. 2012), *appeal denied*, 69 A.3d 601 (Pa. 2013). The defendant need not be a party to a completed crime; rather, one perpetrates a felony when he engages in or is an accomplice to a completed felony, an attempt to commit a felony, or flight after committing or attempting to commit a felony. 18 Pa.C.S.A. § 2502(d).

Robbery is among the enumerated felonies that may satisfy the predicate-offense element of second-degree murder. *Id.* A person commits robbery where, *inter alia*, in the course of committing a theft, he inflicts or threatens serious bodily injury on another, commits or threatens immediately to commit any felony of the first or second degree, or takes or removes property from the person of another by force however slight. 18 Pa.C.S.A. § 3701(a)(1). The evidence is sufficient to sustain a robbery conviction where the defendant intentionally assists his cohort with the robbery, even if he or she did not carry a weapon, employ threats, or cause injury. *E.g.*, *Commonwealth v. Everett*, 443 A.2d 1142, 1145 (Pa.Super. 1982).

The very nature of accomplice liability is that one who actively and purposefully engages in criminal activity is criminally responsible for the criminal actions of his/her co-accomplice which are committed in furtherance of the criminal endeavor. However, in order to impose this form of criminal liability, the individual "must be an active partner in the intent to commit [a crime]." *Commonwealth v. Fields*, 333 A.2d 745, 747 (Pa. 1975). Further, an accomplice "must have done something to participate in the venture." *Commonwealth v. Flowers*, 387 A.2d 1268, 1270 (Pa. 1978). Such a finding cannot be based upon mere assumption or speculation. "Mere presence at the scene is insufficient to support a conviction: evidence

- 13 -

indicating participation in the crime is required." ***Commonwealth v. Keblitis***, 456 A.2d 149, 151 (Pa. 1983).

We find that there was substantial evidence presented that appellant's role in the events giving rise to the charges was more extensive than merely being present. First, during appellant's first statement to the police, he lied and stated he did not know anything about the victim's death. Thereafter, on March 6, 2012, appellant admitted to Detective Zimmerman, he was present with Barnes from the time the call was placed to the victim to arrange a meeting until the time when the victim was shot, and when the victim was left dead on the roadway. However, when confronted with the physical evidence, appellant changed his story again and stated that the victim was shot outside of the car. Both appellant and Barnes fled the scene, and appellant admitted that the men destroyed evidence. Two different guns were used, and the victim sustained multiple gunshot wounds from each weapon at close range. We find that a conspiratorial agreement can be reasonably deduced from these facts. The jury was free to infer a consciousness of guilt because appellant's inconsistent statements and flight were efforts to avert suspicion. ***See Commonwealth v. Donnelly***, 653 A.2d 35 (Pa.Super. 1995), ***appeal denied***, 663 A.2d 686 (Pa. 1995)(false and contradictory statements by the accused are evidence from which a jury may infer that they were made with the intent to mislead police and are indicative of guilt); ***Commonwealth v. Coyle***, 203 A.2d 782 (Pa. 1964)

(flight as evidence of consciousness of guilt may form the basis in connection with other proof from which guilt may be inferred). Appellant's girlfriend also testified that his behavior changed after the incident and he asked her to lie for him; again, the jury was free to infer a consciousness of guilt. All of this evidence supports appellant's complicity in the crimes and not an innocent bystander.

Appellant also argues that the Commonwealth failed to prove that appellant carried a firearm without a license. (Appellant's brief at 26.) It is a crime in Pennsylvania to carry a firearm without a valid and lawfully issued license. 18 Pa.C.S.A. § 6106(a)(1). The Commonwealth can prove possession through the doctrine of constructive possession. **Commonwealth v. Duffy**, 340 A.2d 869, 870 (Pa.Super. 1975). To do this, the Commonwealth must present evidence to show that appellant had both the power to control the firearm and the intent to exercise that control. **Id.**

Again, through appellant's own admission, he retrieved the gun that fell out of the victim's pocket when he allegedly pulled the victim out of the car. Appellant also admitted that he drove Barnes home in the car with the weapons. It was stipulated that appellant did not have a license to carry a weapon. Thus, the Commonwealth presented sufficient evidence to support his conviction.

Finally, appellant argues that the Commonwealth did not prove that appellant tampered with evidence on the night in question. It is also a crime in Pennsylvania where a defendant, believing that an official proceeding or investigation is pending or about to be instituted, alters, destroys, conceals, or removes anything with intent to impair its verity or availability in such a proceeding or investigation. 18 Pa.C.S.A. § 4910(1). Appellant admitted to collecting the spent shell casings, therefore removing evidence. The statement appellant provided to the police also indicates that appellant and Barnes flushed the casings down the toilet at appellant's house. No relief is due.

The last issue presented is whether the trial court erred in denying his motion to suppress his March 8, 2013 confession; appellant argues that his statement should be suppressed because he asserted his right to remain silent. We disagree.

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

***Commonwealth v. Minnich***, 874 A.2d 1234, 1236 (Pa.Super. 2005) (citation omitted).

We briefly review the facts presented at the suppression hearing. Detective Richard Iachini testified that on March 6, 2013, he was directed to speak with appellant to see if he would agree to come to the police station to speak with the police. (Notes of testimony 3/20/14 at 9-11.) The detectives arrived, in plain clothes, to appellant's home. Appellant agreed and voluntarily got in the back seat of the unmarked police car; he was not handcuffed or searched. Detective Iachini stated the mood was "nonchalant . . . calm and laid back." (***Id.*** at 12.)

Detective Jeffrey Schriver was one of the detectives that interviewed appellant on March 6, 2013; appellant was not ***Mirandized***. (***Id.*** at 39.) Detective Schriver testified that the police had obtained the victim's telephone records and established that Barnes was the last person he spoke to before he was shot. As Barnes had told the officers that he had been with appellant the day of the homicide, the officers wanted to investigate Barnes' alibi. (***Id.*** at 36.) At this point, the officers had no reason to believe that appellant was involved with the shooting death. (***Id.***) The detective asked appellant about his whereabouts, and he was not questioned about his involvement with the murder of the victim. The detective did not "ask [appellant] any questions that in [his] mind . . . would elicit anything

incriminating." (***Id.*** at 38.) Appellant agreed to have his statement tape recorded; appellant then left. (***Id.*** at 39.)

Officer Thomas Carter also testified at the suppression hearing. Officer Carter explained that on March 8, 2013, appellant agreed to another interview about his previous statements. (***Id.*** at 24.) Officer Carter drove appellant to the station and explained to him that he was not under arrest. (***Id.*** at 26.) Officer Carter testified that appellant was free to leave and was not in custody at this time. (***Id.*** at 27.) Appellant chose to sit and talk with the officers.

Appellant met with Detective Zimmerman and Detective Schriver in an interview room; the door was left open. (***Id.*** at 40.) The purpose was to speak with appellant about the discrepancies in his March 6th statement. (***Id.***) Appellant was told he was free to leave at any time and then he was ***Mirandized***; appellant signed a written waiver form. (***Id.*** at 41-42.) Thereafter, appellant's statement was recorded.

Detective Zimmerman asked, "Are you willing to provide a statement regarding the incident?" and appellant stated "no." (***Id.*** at 51.) Thereafter, Detective Zimmerman began to ask appellant questions; he was not re-***Mirandized***. (***Id.*** at 51-52.) Detective Schriver, however, explained that there was "some confusion." (***Id.*** at 51, 53.)

> Well, prior to even starting this formal statement, we asked [appellant], are you willing to provide a formal statement. And he said yes. And we offered him three ways to do it. He could handwrite it, we could

> type it, or we could tape record it. He chose tape recorded. So, you know, I recall him saying no, but prior to that he indicated he would give us a statement. . . . After he said no, Detective Zimmerman asked him two more times if he was willing to provide a statement and appellant said yes.

*Id.* at 53-54.

Herein, appellant came to and remained at the police station of his own volition. He was repeatedly advised that he was free to leave at any point. He was also advised of his ***Miranda*** rights while at the police station. Thereafter, appellant agreed to provide a recorded statement.

We agree with the Commonwealth that the testimony presented at the suppression hearing demonstrates that appellant's initial response of "no" caused confusion as he had just agreed moments earlier that he was going to speak to the police and that he wanted the statement recorded. The questions posed following the answer of "no" were intended to clarify appellant's desire to give a recorded statement. The follow-up questions clarified appellant's true intention to waive his right to remain silent as appellant continued to answer the questions that followed. ***See Connecticut v. Barrett***, 479 U.S. 523, 529-530 (1987) (defendant's agreement to answer oral questions but not give any written statement without counsel present was unequivocal waiver of his right to remain silent).

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/23/2015