**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Sarita MILLER, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 5, 2005.

Filed April 24, 2006.

**1284**

---

Mitchell S. Strutin, Philadelphia, for appellant.

Hugh J. Burns, Jr., Asst. Dist. Atty., Philadelphia, for Com., appellee.

BEFORE: TODD, BOWES and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 In June, 2003, appellant Sarita Miller was arrested and charged with the brutal murder of Rita Nagle. After a jury trial, she was convicted of first degree murder,[1] robbery,[2] forgery,[3] criminal trespass,[4] possessing instruments of crime,[5] access device fraud,[6] and theft by unlawful taking.[7] She was sentenced, on October 15, 2004, to a life term plus an aggregate, concurrent sentence of eighteen years and three months to forty-one years. This timely appeal followed.

¶ 2 Appellant first argues the evidence presented was insufficient to sustain her conviction for first degree murder. Specifically, appellant contends her drugged condition on the day of the murder negated her ability to form the requisite specific intent. She also maintains, "[t]he Commonwealth failed to sustain its burden of proving that appellant was not in a drugged condition and capable of forming specific intent to kill at the time of the incident." Appellant's brief at 17.

¶ 3 This implicates a challenge to the sufficiency of the evidence.

The standard we apply in reviewing the sufficiency of the evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the factfinder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude

---

1. 18 Pa.C.S.A. § 2502(a).

2. *Id.* § 3701.

3. *Id.* § 4101.

4. *Id.* § 3503(a).

5. *Id.* § 907.

6. *Id.* § 4106.

7. *Id.* § 3921.

every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of the witnesses and the weight of the evidence produced, may believe all, part or none of the evidence.

*Commonwealth v. Zingarelli*, 839 A.2d 1064, 1069 (Pa.Super.2003), *appeal denied*, 579 Pa. 692, 856 A.2d 834 (2004) (citations and quotations omitted).

 ¶ 4 To successfully prosecute a charge of first degree murder, the Commonwealth must establish the defendant acted with a specific intent to kill and that the killing was willful, deliberate and premeditated. *Commonwealth v. Cuevas*, 574 Pa. 409, 832 A.2d 388 (2003). A specific intent to kill may be proved by wholly circumstantial evidence and may be inferred by the defendant's use of a weapon on a vital part of the victim's body. *Commonwealth v. Fletcher*, 580 Pa. 403, 861 A.2d 898 (2004); *Commonwealth v. Hanible*, 575 Pa. 255, 836 A.2d 36 (2003), *cert. denied*, 543 U.S. 835, 125 S.Ct. 248, 160 L.Ed.2d 55 (2004).

[W]hen asserting a diminished capacity defense to first degree murder, a defendant attempts to negate the element of specific intent to kill and, if successful, first degree murder is reduced to third degree murder. Diminished capacity is an extremely limited defense, which requires extensive psychiatric testimony establishing a defendant suffered from one or more mental disorders which prevented him form formulating the specific intent to kill. Only where a defendant admits liability and contests the degree of guilt is a diminished capacity defense available.

*Cuevas, supra*, at 418, 832 A.2d at 393 (citations omitted). Voluntary intoxication or a drugged condition is not a defense to a criminal charge, but may be introduced, "whenever it is relevant to reduce murder from a higher degree to a lower degree of murder." 18 Pa.C.S.A. § 308, **Intoxication or drugged condition**. In order for intoxication to negate the specific intent to kill necessary for first degree murder, the evidence presented must show defendant was unable to form the specific intent because he or she was so overwhelmed or overpowered by drugs to the point of having lost his faculties at the time of the crime. *Fletcher, supra*.

¶ 5 Initially, we note that evidence of intoxication places no additional burden on the Commonwealth. *Commonwealth v. Tucker*, 267 Pa.Super. 243, 406 A.2d 785 (1979). Contrary to appellant's argument, therefore, the Commonwealth was not required to "disprove" her intoxication at the time of the crimes. Via multiple witnesses and a plethora of physical and expert evidence, the Commonwealth proved that after the victim refused appellant's request for money to buy crack cocaine, appellant retrieved a hammer and knife, bludgeoned the victim nine times in the head, stabbed her in the throat and chest 25 times, stole and used the victim's checks, credit cards and vehicle, and left her corpse to be discovered by family members days later.

Appellant initially denied having committed the murder, pinning the crime instead on a friend, Charles Curtis, who had helped her spend her spoils after the murder. When challenged by the police, however, appellant admitted she did hit the victim once in the head with the hammer, but purportedly only upon threat of death by Curtis.

¶ 6 Nowhere in her statement offered to police did appellant contend she was under the influence of drugs or alcohol on the day her cohort allegedly forced her to hit the victim in the head with the hammer. N.T, 8/18/04 at 16. Nevertheless, in support of her intoxication defense to first degree murder, appellant offered testimony by Dr. Steven E. Samuel, a psychologist who met with her one year after the murder, in June, 2004, and who testified appellant suffered from cocaine and marijuana dependency, and was addicted at the time of the murder. N.T., 8/23/04 at 42, 47. As for whether appellant was "high" on the day of the murder, Dr. Samuel testified, "I can only tell you what she said and that she got high all week before this occurred and she told me for several days after this occurred, that's exactly and the extent of what she told me." *Id.* at 87. The jury, sitting as the trier of fact, listened to this testimony, as well as all other testimony offered, exercised its discretion, and found the doctor's statement testimony referencing appellant's self-serving testimony unpersuasive and not sufficient to reduce the charge from first degree murder. Appellant has not presented us with any evidence to convince us to disturb the jury's credibility determination. *See Zingarelli, supra.*

¶ 7 Appellant next argues the trial court erred by admitting into evidence pictures of the crime scene and autopsy, and also testimony concerning a set of knives from which the murder weapon allegedly was obtained. First, appellant asserts generally, without specifying a certain picture or pictures, that the court erred by admitting inflammatory and prejudicial photographs "depicting the victim's lifeless body with contusions, abrasions, stab wounds and blood on and around it." Appellant's brief at 18 & 21.

As a general rule, this Court's standard of review of a trial court's evidentiary ruling . . . is limited to determining whether the trial court abused its discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Dengler,* —— Pa. ——, 890 A.2d 372, 379 (2005). Evidence is relevant, and therefore admissible, if it logically tends to establish a material fact in the case, or supports a reasonable inference or presumption regarding the existence of a material fact. *Commonwealth v. Robinson,* 554 Pa. 293, 721 A.2d 344 (1998), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000).

It has been a steadfast principle of our jurisprudence that pictures of the victim are not *per se* inadmissible. In relation to admissibility of these photographs, we have promulgated the following test:

[A] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs

are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible.

The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error. As we also explained in [*Commonwealth v.*] *Rush* [, 538 Pa. 104, 111, 646 A.2d 557, 560 (1994) ]:

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt. Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs.

*Commonwealth v. Robinson,* 581 Pa. 154, 224, 864 A.2d 460, 501–502 (2004), *cert.*

*denied,* —— U.S. ——, 126 S.Ct. 559, 163 L.Ed.2d 470 (2005).

■ ¶ 8 Because we are not privy to the photographs of the victim's body or the crime scene, as they were not included in the certified record transmitted to this Court, we look to the trial court's resolution of the challenge:

> All photographs which depicted the body, approximately 13, were in black and white.... [A]ll of the close up photographs of the victim's wounds ... presented to the jury were in black and white and as such did not highlight the gory details of the killing. Further, the photographs were culled so as to not be cumulative and were relevant to demonstrate that the killing was intentional. The photographs were necessary to accurately portray the crime scene, and the nature and extent of the victim's injuries. The photos were necessary to aid the jury in determining whether or not the killing was intentional. *Jacobs, supra.* at 407, 639 A.2d 786.[8] (photographs depicting the massive number of wounds inflicted upon the victim admissible to show killing was intentional).

Trial Court Opinion, Lewis, J., 6/13/05 at 11–12. We defer to the discretion of the trial judge who had the opportunity to view these photographs.

■ ¶ 9 As for the knife set, appellant argues she is entitled to a new trial, "as a result of the trial court's ruling allowing the Commonwealth to present testimony concerning the recovery of certain knives[,] from the trunk of a Cadillac[,] that were not shown to have been involved in the incident that resulted in the victim's death. (N.T. 8/19/04 p. 48, 50, 56)." Appellant's brief at 49. It is appellant's posi-

---

8. *Commonwealth v. Jacobs,* 536 Pa. 402, 639 A.2d 786 (1994).

tion that testimony concerning the recovery of these knives was irrelevant and prejudicial in the absence of any testimony linking these knives to the murder. Appellant argues "the trial court's ruling in this regard allowed the jury to consider evidence of unrelated criminal conduct." Appellant's brief at 52. We consider this argument keeping in mind the standard for the admissibility of evidence set forth above.

¶ 10 The testimony in question was offered by Officer Edward Schikel, of the City of Philadelphia Crime Scene Unit, who was present when a search warrant was executed on the appellant's car and a set of knives with one knife missing was retrieved from the trunk. Photographs of this knife set were admitted without objection and shown to the jury, but when the Commonwealth attempted to show the jury the actual knife set, an objection was made, counsel arguing, "There's no connection between that item and that I know of in the discovery and between the death of Rita Nagel." *Sic*, N.T., 8/19/04 at 55. The court overruled the objection, apparently accepting the Commonwealth's reasoning that the missing knife could have been "circumstantial evidence that the defendant was in possession of knives that could have caused the injury." *Id.* at 56.

¶ 11 As stated above, evidence is relevant if it tends to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Pa.R.E. 401, **Definition of "relevant evidence"**. The evidence presented at trial established the victim was stabbed numerous times. A knife set with one knife missing was found in appellant's car after she was arrested. Charles Curtis, the man who appellant argued initiated the attack upon the victim and forced her to strike the victim in the head with a hammer, testified that appellant admitted to him she had killed the victim by stabbing her and striking her in the head with a hammer. N.T., 8/19/04 at 104–106. He added that appellant showed him the hammer and knife she used, and he was with her when she disposed of the weapons in a plastic bag in an abandoned lot. *Id.* at 126–128. These same weapons were later retrieved from that lot. Clearly, testimony presented with regard to a knife set, minus one, found in the trunk of appellant's car, was relevant, "to show that the [appellant] was in possession of a knife which could have been one of the murder weapons." Trial Court Opinion at 24. There was no error.

¶ 12 Next, appellant argues she is entitled to a new trial on the basis that the trial court allowed testimony concerning her alleged lesbian relationship with a Commonwealth witness, Naomi Moten. Appellant references a discussion before and during jury selection, the Commonwealth's opening statement, Moten's testimony, and the prosecution's closing. N.T., 8/12/04 at 21–22, 81; N.T., 8/13/04 at 224; N.T., 8/17/04 at 32–33; and N.T., 8/24/04 at 104, 108.

¶ 13 Prior to jury selection, counsel discussed proposed *voir dire* questions, one of which, suggested by the Commonwealth, was: "[t]here will be evidence in this case that the defendant engaged in a bisexual relationship with one or more of the witnesses. Would this fact cause you to be unable to be a fair and impartial juror?" N.T., 8/12/04 at 13–14. Defense counsel objected to the line of questioning, arguing it was irrelevant; "I don't see any relevancy to any alleged homosexual relationship between Naomi Moten and my client to

the crime that's been charged in this case." *Id.* at 15–16. Defense counsel also feared the jurors may have prejudice against those who practice alternative lifestyles and would hold it against the appellant. *Id.* at 16.

¶ 14 The Commonwealth explained that the query was necessary because when Moten was called as a witness and was asked about her relationship with appellant, the women's sexual relationship most likely would come to the forefront.

> And that will be relevant because the nature of their relationship will help explain why the defendant may have come to her, confided in her, given her name during initial parts of her statement to Homicide.

> Lakia Green, jail house witness, does also make mention of the relationship between Sarita Miller as told to her regarding Naomi Motten [sic] as well as why Sarita Miller mentioned Naomi Motten [sic] to police, hoping that she would give her an alibi when in fact Naomi Motten [sic] told the police that Sarita Miller confessed to the killing to her.

*Id.* at 15. The Commonwealth posited that its reason for broaching the subject was that individuals in an intimate relationship tend to be more open and honest with his or her partner ("pillow talk") than they may be with casual acquaintances, and the Commonwealth intended to examine Moten with regard to the secret the appellant had entrusted her—that she did indeed kill the victim.

¶ 15 The trial court agreed to allow the jury question, explaining, "if some person has some views or some feelings about allegations of a bisexual relationship, wouldn't it be appropriate to ask that so if that is the case, we find that out before that person is selected as a potential juror, rather than have any inference of that come out during the trial and someone does harbor some views or thoughts about it and at that point they would have already been seated?" *Id.* at 16. The defense conceded to the *voir dire* question if the court intended to allow testimony regarding the sexual relationship between Moten and appellant, but argued further against the admission at trial of such testimony. *Id.*

¶ 16 A review of the discussion seems to indicate defense counsel was seeking a ruling in the nature of a grant of a motion in *limine* to preclude mention of the relationship between the witness and appellant. The court did not enter any such ruling and explained, reasonably, that if the nature of Moten's and appellant's relationship was mentioned at trial it most likely would be merely to describe, "the nature of the relationship between the two people[,"] and would be a matter of credibility. *Id.* at 21. "Is the person giving the testimony your brother, your sister, your mother, your best friend, your enemy, your lover? I mean, it comes out. It's a matter that comes out by way of either as it will impact on credibility, bias or interest of a witness." *Id.*

¶ 17 The court's resolution of appellant's objection to the *voir dire* query was correct and served to safely eliminate possible bias by potential jurors who found homosexuality offensive. When the Commonwealth mentioned the lesbian relationship during its opening and closing arguments, and questioned Moten concerning the nature of her relationship with appellant, it was done without objection by the defense and for the sole purpose of lending support to its argument that appellant saw Moten

as her confidante, her safe haven, and it was to Moten that appellant admitted her guilt. There was no error by the trial court.

¶ 18 Appellant also argues she is entitled to a new trial on the basis the trial court erred by (1) allowing the Commonwealth to ask potential jurors if they would be prejudiced against a person of the Muslim faith; and (2) allowing mention of her Muslim garb at trial. N.T., 8/12/04 at 31–32; N.T., 8/13/04 at 244; N.T., 8/16/04 at 109.

¶ 19 At jury selection, the *defense* asked that the following question be posed to potential jurors: "[t]he defendant Sarita Miller is of the Muslim faith. Do any of you believe that you would be biased against Miss Miller or would be unable to be fair to her in this case as a result of her being of the Muslim faith?" N.T., 8/12/04 at 25. Clearly it was the defense who first chose to advise the jury that appellant was Muslim.

¶ 20 As for mention of appellant's Muslim garb worn at trial, we note that defense counsel did not challenge the Commonwealth's question and therefore any objection is waived. *See Commonwealth v. Johnson,* 874 A.2d 66 (Pa.Super.2005) (holding failure to object at the time of the testimony results in waiver of challenge on appeal).

¶ 21 Nevertheless, the trial court, concerned as to the relevance of mention of the appellant's chosen faith, asked counsel what was the purpose of the line of questioning. N.T., 8/16/04 at 110. Counsel for the Commonwealth explained she was seeking to establish that appellant had changed her appearance in an effort to hoodwink the jury into thinking she could not possibly have been the perpetrator, who was described as wearing, *inter alia,* tight jeans and cut-off t-shirts. The court acknowledged that a witness may comment on the fact a defendant has changed her appearance since the last time he or she saw her, but admonished counsel to steer clear of any mention of religion. *Id.* at 112. The Commonwealth complied. We agree with the manner in which the trial court handled this situation, exercising its discretion in an appropriate fashion.

¶ 22 Appellant's final two issues raise claims of ineffective assistance of trial counsel: (1) not objecting when the Commonwealth referred to appellant as a predator during its opening and closing statements; and (2) conceding appellant's guilt during defense counsel's opening and closing statements. N.T., 8/13/04 at 221–222; N.T., 8/24/04 at 98; N.T., 8/13/04 at 229; N.T., 8/24/04 at 57–58. While claims of ineffective assistance generally are considered only in petitions for post-conviction collateral relief (PCRA[9]), *see Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), in the matter before us, these allegations of trial counsel's errors were raised by new counsel in his post-sentence motion, and the court specifically conducted an evidentiary hearing for the purpose of resolving these claims. N.T., 3/17/05. On that basis, we may consider the ineffectiveness claims on direct appeal. *See Commonwealth v. Chmiel,* 585 Pa. 547, 889 A.2d 501 (2005); *Commonwealth v. Fitzgerald,* 877 A.2d 1273 (Pa.Super.2005), appeal denied, —— Pa. ——, 891 A.2d 730 (2005).

¶ 23 With regard to claims of ineffectiveness, this Court has observed:

In order for Appellant to prevail on a claim of ineffective assistance of counsel,

---

9. 42 Pa.C.S.A. §§ 9541–9546.

he must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. *Commonwealth v. Kimball,* 555 Pa. 299, 724 A.2d 326, 333 (1999). Appellant must demonstrate: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different. *Id.* The petitioner bears the burden of proving all three prongs of the test. *Commonwealth v. Meadows,* [567 Pa. 344, 355–56, 787 A.2d 312, 319–20 (2001) ].

*Commonwealth v. Johnson,* 868 A.2d 1278, 1281 (Pa.Super.2005), *appeal denied,* 583 Pa. 680, 877 A.2d 460 (2005).

Prosecutorial misconduct does not occur unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Due to the nature of a criminal trial, both sides must be allowed reasonable latitude in presenting their cases to the jury.

*Chmiel, supra,* at 542. Prosecutorial misconduct will not be found where comments made were done so for oratorical flair. *Id.* at 544.

¶ 24 In support of his prosecutorial misconduct claim, appellant relies on *Commonwealth v. Scarfo,* 416 Pa.Super. 329, 611 A.2d 242, 283 (1992), wherein this Court concluded counsel's comparison of the defendant to a wolf, "exceeded the bounds of propriety and constituted an appeal to the passions and prejudices of the jury." *Id.* (*quoting Commonwealth v. Lipscomb,* 455 Pa. 525, 317 A.2d 205 (1974)).

¶ 25 We have reviewed the Commonwealth's opening and closing statements concerning the use of the noun "predator" and verb "preys", and conclude the prosecutor's use of these terms was not so prejudicial or inflammatory as to warrant a mistrial or grant of a new trial. The comments in *Scarfo* are much more egregious, comparing the defendant to a cowardly animal (wolf) that seeks out the elderly or those with infirmities. Here, the appellant asked her victim for money and, when refused, came back with a hammer and knife and bludgeoned and stabbed her to death, slitting her throat. In the days that followed, she returned to the apartment and stole checks, credit cards and the victim's car, each time walking past the victim's corpse sitting at the kitchen table. Appellant's actions could reasonably be termed predatory, and the prosecutor did not err by employing these descriptive terms. *See, e.g., Commonwealth v. Miles,* 545 Pa. 500, 511, 681 A.2d 1295. 1300 (1996), *cert. denied,* 520 U.S. 1187, 117 S.Ct. 1472, 137 L.Ed.2d 684 (1997) (concluding prosecutor's comparison of defendant's actions to the hunting style of "animals of prey" was not improper); *Commonwealth v. Van Horn,* 797 A.2d 983 (Pa.Super.2002) (holding prosecutor's characterization of victim as prey was within the limits of proper oratorical flair).

¶ 26 Finally, appellant claims defense counsel was ineffective for "conceding the appellant's guilt during his opening statement and summation to the jury.

(N.T. 8/13/04 p. 229; 8/24/04 p. 57–58)." Appellant's brief at 36. When questioned by the trial court as to whether counsel realized he had conceded his client's guilt, trial counsel explained it was his strategy to argue that appellant was guilty of something less than first or second degree murder, and that he had discussed this trial tactic with his client. *Id.* at 237–238. "[O]ur argument is it's either third or it's voluntary." *Id.* at 238. "I told her that we had to be honest and I thought that was the best strategy, especially in light of Your Honor's ruling that her statements come into evidence." *Id.* at 239. In his closing argument, defense counsel again urged that his client was not guilty of first or second degree murder, and it was the jury's job to ascertain the degree of guilt. "It is not a case of first or second degree murder. What it is you will determine, but that was the reason that we went to trial in this case." N.T., 8/24/04 at 57. Appellant denies that counsel discussed this strategy and that she gave her approval. Appellant's brief at 37. Appellant argues, "where trial counsel's trial strategy makes the outcome of a trial a foregone conclusion, the trial court is obligated to colloquy the appellant as if she were entering a guilty plea." *Id.* at 48.

¶ 27 At the hearing on appellant's ineffectiveness claims, trial counsel testified as did appellant. With regard to this particular claim, counsel testified he thoroughly discussed his trial strategy with appellant and told her they had two alternative trial strategies, and that "everything turned on" whether the motion to suppress her statements made to police was granted or denied. Counsel explained,

if Judge Lewis granted the motion to suppress my client's statements to the police authorities, that [sic] we would be able to concentrate on the lack of credibility of Charles Curtis and any other layperson that claimed that Sarita has confessed to this crime, but on the other hand, if Judge Lewis denied the Motion to Suppress, then I would be faced as a trial counsel with so many different statements confessing to this crime that I would have to use an alternative strategy in order to have sufficient credibility with the jury, and that strategy basically was while attacking the credibility of Charles Curtis and the other lay witness or witnesses to whom Ms. Miller confessed, to ultimately admit to the jury that the last two pages of her statement to the detective who took her statement were basically the truth and that her participation in this terrible incident was limited to that and that the jury should look upon that as having credibility and find her guilty of something less than first-degree or second-degree murder because that was the only reason we're going to trial.

Ms. Miller told me she would plead guilty to third-degree murder, but I could not negotiate that for her, so that's why— so that's why we went to trial, to try to obtain a guilty verdict of something less than first- or second-degree murder.

N.T., 3/17/05 at 10–11.

¶ 28 Appellant testified with regard to this ineffectiveness claim and stated, "[h]e didn't go into specific the words that he would use to the jury. The only thing that he said was that he would try to convince the jury that I was guilty of something less than first or second degree. Now, striking Ms. Rita Nagel and the checks, I don't know what that falls under, so I was willing to admit to third-degree." *Id.* at 39. Appellant told the court counsel did advise

her that the, "odds were stacked against [her]," and he discussed with her the possible avenues of defense available to her (entry of a guilty plea, admitting to murder generally and allowing the court to ascertain the degree of guilt), but that she, "would rather take it to trial[.]" *Id.* at 38. When asked by her own appellate counsel whether she would have been agreeable to a trial strategy that included an admission of guilt, appellant replied,

> [s]omething, not guilty of murder. I was guilty of hitting her, yes, I was guilty of striking her, I was guilty of her checks, the things that I was guilty of. Not guilty of first-degree murder. That was my understanding.

*Id.* at 38–39.

¶ 29 A review of the record indicates appellant was well aware of counsel's strategy and agreed to it. Given the plethora of evidence, we conclude counsel's strategy was sound.

¶ 30 Having considered each of appellant's arguments and finding them devoid of merit, we affirm the October 15, 2004 judgment of sentence.

¶ 31 Judgment of sentence affirmed.