COMMONWEALTH of Pennsylvania, Appellee

v.

Jared HENKEL, Appellant.

Commonwealth of Pennsylvania, Appellee

v.

Jared Lischner, Appellant.

Commonwealth of Pennsylvania, Appellee

v.

Craig Elias, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 31, 2007.
Filed Nov. 14, 2007.
Reargument Denied Jan. 23, 2008.

Thomas R. Ceraso, New Kensington, for Henkel.

Patrick J. Thomassey, Monroeville, for Lischner.

Caroline Roberto, Pittsburgh, for Elias.

Michael W. Streily, Deputy Dist. Atty., Pittsburgh and Kevin F. McCarthy, Asst. Dist Atty., Pittsburgh, for Com., appellee.

BEFORE: FORD ELLIOTT, P.J., ORIE MELVIN and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Craig Elias, Jared Henkel and Jared Lischner each appeals from his respective January 22, 2004, aggregate judgment of sentence of life imprisonment. The sentences were imposed after a jury found the three men guilty of various crimes committed in connection with the brutal abductions of Anthony Brownlee and Andrew Jones, which ultimately resulted in Jones' death. We consolidated the three appeals *sua sponte. See generally,* Pa.R.A.P. 513, **Consolidation of Multiple Appeals.**

¶ 2 Craig Elias' judgment of sentence was imposed after a jury found him guilty of first-degree murder,[1] two counts of kidnapping,[2] and one count each of robbery,[3] aggravated assault,[4] simple assault,[5] and abuse of a corpse.[6] Jared Henkel's sentence was imposed after the same jury found he was guilty of one count of second degree murder,[7] two counts of kidnapping, and one count each of robbery, aggravated assault, simple assault, and criminal conspiracy.[8] Jared Lischner was sentenced after the jury found him guilty of one count of second degree murder, two counts

of kidnapping, and one count each of robbery, simple assault, and criminal conspiracy in connection with the abductions.

¶ 3 Before disposing of the issues raised in each appeal, we will set forth the common factual and procedural histories of these cases. Appellants and the victims, Brownlee and Jones, were drug dealers who had a common stash house in the Mount Washington area of Pittsburgh where they stored safes full of cash and drugs. Trial Court Opinion, Manning, J., 12/29/05, at 8. On March 22, 2002, appellant Henkel discovered the stash house had been broken into and the safes stolen. *Id.*

¶ 4 Appellants immediately were suspicious of an inside job and their suspicions pointed them to Brownlee and Jones. Trial Court Opinion at 9. After appellant Henkel convinced Brownlee and Jones to come to the stash house, appellants assaulted the pair, bound them with duct tape, and conducted a violent physical interrogation that ultimately resulted in the strangling death of Jones. *Id.* Brownlee was released after paying ransom. *Id.* at 9–10.

¶ 5 Appellant Elias and Matthew Henkel, appellant Henkel's brother, transported Jones' body to the Steubenville, Ohio, area, located a bridge along the Ohio River, and then disposed of Jones' body by affixing a 50–pound weight to the corpse. Trial Court Opinion at 13–14. During the drive to the Steubenville bridge, Matthew asked Elias if "[Jones] had said anything" while

---

1. 18 Pa.C.S.A. § 2502(a).

2. *Id.* at §§ 2901(a)(1)(2)(3).

3. *Id.* at §§ 3701(a)(1)(i)(ii).

4. *Id.* at § 2702(a)(1).

5. *Id.* at § 2701(a)(1).

6. *Id.* at § 5510.

7. *Id.* at § 2502(b).

8. *Id.* at § 903(a)(1).

Elias was strangling him to death. *Id.* at 14, *citing N.T.*, 10/16/03, at 547. Elias told Matthew that Jones had whispered "Craig, you are killing me." *Id.* Elias responded to Jones by cryptically stating "I know." *Id.*

¶ 6 Appellants were tried jointly before a jury from October 14th through October 21, 2003. At trial, Matthew Henkel was the prosecution's chief witness; he testified against appellants in exchange for immunity. Trial Court Opinion at 8. While appellants attacked Matthew's mental competency and his credibility at trial, these attacks ultimately proved unsuccessful. The judgments of sentence subject to this appeal were imposed shortly after the jury returned its verdict.

¶ 7 On January 30, 2004, appellants Henkel and Lischner each filed post-sentence motions seeking various forms of relief. On February 2, 2004, Elias filed a post-sentence motion of his own. The trial court denied these motions in a series of Orders dated May 19, 2004. Appellants subsequently notified the trial court of their intent to appeal. The trial court responded by issuing a Rule 1925(b) Order with which appellants complied. *See generally,* Pa.R.A.P. 1925, **Opinion in Support of Order.**

¶ 8 On June 12, 2006, appellant Henkel filed a petition for remand pursuant to Rule 720 of the Pennsylvania Rules of Criminal Procedure and a motion for stay during pendency of appellant's petition for remand. Pa.R.Crim.P. 720, **Post–Sentence Procedures; Appeal, (c) After–Discovered Evidence.** Appellants Elias and Lischner filed similar pleadings on June 13, 2006, and June 14, 2006, respectively. Attached to appellants' petitions and motions was a signed and sworn affidavit from the Henkel brothers' mother. In the affidavit, Mrs. Henkel testified that she hypnotized Matthew in June or early July

of 2003 and that while Matthew was hypnotized, she asked him a number of questions about the kidnapping and murder in order to help him "accept his memories and come to terms with the fact that it was not his fault." Supplemental Record No. 1, 3/6/07. Appellant Henkel alleged his brother Matthew's story to investigators drastically changed after he was hypnotized.

¶ 9 This Court denied appellants' petition and motions without prejudice on June 20, 2006, thereby allowing appellants to raise the hypnotism issue anew in their briefs and at oral argument. After appellants filed their briefs, we reviewed the hypnosis issue in detail and remanded the matter by Order of March 20, 2007, instructing the trial court to conduct an evidentiary hearing to determine whether Matthew Henkel was hypnotized by his mother and, if he was, to determine when the hypnosis was induced and what specific portions of Matthew's testimony were elicited by the hypnosis. *Commonwealth v. Henkel, et. al.,* 927 A.2d 652 (Pa.Super.2007) (unpublished Memorandum). Our remand Order further instructed the trial court to file an addendum to its December 29, 2005, Opinion outlining its findings after conducting the evidentiary hearing. Appellants were given 30 days from the date on which the trial court filed its addendum to respond. In issuing our remand Order, we postponed the consideration of the remaining issues raised by appellants until after the trial court's evidentiary hearing.

¶ 10 The evidentiary hearing was held June 5–7, 2007, during which time the trial court heard testimony from, among others, Matthew, his mother, and various experts on hypnotism. Thereafter, the court found Matthew had not been hypnotized by his mother after the evidence demonstrated "Mrs. Henkel had no training or experi-

ence in the practice of inducing hypnotic trance in others." Addendum to Opinion of the Court dated December 29, 2005, Manning, J., 7/12/07, at 22. On August 17, 2007, after being granted an extension of time upon application to this Court, each appellant filed a brief challenging the trial court's factual findings. Initially, we turn to the propriety of the trial court's finding that Matthew Henkel was not hypnotized.

¶ 11 Elias and Lischner allege the record does not provide sufficient support for the trial court's finding that Mrs. Henkel did not hypnotize Matthew. Elias brief at 20. Accordingly, we will treat Elias and Lischner's challenge as an attack on the sufficiency of the evidence. In reviewing a challenge to the sufficiency of the evidence, our standard of review requires us to examine all of the evidence admitted at the hearing, together with any reasonable inferences drawn therefrom, in the light most favorable to the party whose position is bolstered by the trial court's findings. *See Commonwealth v. Crabill*, 926 A.2d 488, 490 (Pa.Super.2007), *citing Commonwealth v. Eichinger*, 591 Pa. 1, 915 A.2d 1122, 1130 (2007). Our scope of review requires us to examine all of the evidence presented. *Commonwealth v. Segida*, 912 A.2d 841, 844 (Pa.Super.2006), *reargument denied*, —— A.2d ——, 2007 Pa.Super. LEXIS 10*, *citing Commonwealth v. Griscavage*, 512 Pa. 540, 517 A.2d 1256, 1257 (1986). In employing our scope of review, we note that the finder of fact is free to believe all, part, or none of the evidence presented in judging the credibility of the witnesses and the weight to be afforded the evidence produced. *Id.*

¶ 12 Although Elias and Lischner concede Mrs. Henkel had no formal training in hypnosis, they contend the trial court used an overly restrictive definition of "hypnotism" by requiring them to demonstrate Mrs. Henkel had formal training in the hypnotic arts as opposed to taking Mrs. Henkel's word that she had trained herself.

¶ 13 In the affidavit appellants attached to their remand petitions, Mrs. Henkel testified that she had "first gained an interest in hypnotism through Psychology classes" which she asserts she attended at Community College of Allegheny County and at Carlow College spanning a six-year period. Supplemental Record No. 1. At the evidentiary hearing, Mrs. Henkel testified her definition of hypnosis included "whatever technique [she] would use to assist a person who was in pain or otherwise agitated to the extent that it involved relaxation of any sort." N.T., Evidentiary Hearing, 6/5/07, Vol. I, at 69–70. When pressed on cross-examination, Mrs. Henkel was unable to remember the names of the classes she allegedly had taken. *Id.* at 65–69. She testified that she was not taught how to administer hypnosis in any of these classes. *Id.* at 71. She further testified that while she remembered reading books on hypnosis in the past it was "very hard to remember the titles of them." *Id.* at 76–77. Mrs. Henkel testified that she had never visited a hypnotherapist, had never been personally hypnotized, and had only witnessed the process of hypnotism once— when she was a senior in high school attending a short "program" in the high school auditorium. *Id.* at 72, 78.

¶ 14 The trial court defined hypnotism as an altered state of consciousness between sleep and wakefulness induced by a hypnotist and accompanied by heightened concentration and increased susceptibility to suggestion. Addendum to Trial Court Opinion at 15, *citing Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981); Ind.Code Ann. § 25–20.5–1–4, **"Hypnotism" defined**; *People v. Zayas*, 131 Ill.2d 284, 137 Ill.Dec. 568, 546 N.E.2d

513, 515–516 (1989). Dr. Mark King, Ph. D., a tenured professor of psychology at the University of Pittsburgh and former understudy of Milton Erickson—who is regarded in some circles as the "father of hypnosis,"[9] testified for the Commonwealth. Dr. King opined that based on Mrs. Henkel's own recitation of her training and experience it was "highly unlikely" she could have hypnotized Matthew. N.T., 6/6/07, Vol. IV, at 106. Dr. King rendered this opinion with a "high degree of certainty." *Id.* at 105.

¶ 15 We find the trial court's definition of hypnotism is far more appropriate than that advanced by Mrs. Henkel and advocated for by Elias and Lischner. Mrs. Henkel's definition, which includes "relaxation of any sort," is so broad that it encompasses activities such as massages and relaxing in a whirlpool. N.T., Evidentiary Hearing, 6/5/07, Vol. I, at 69–70. While there is no question the concept of hypnotism is amorphous, Mrs. Henkel's definition of the concept would not be accepted by either practitioner or layman.

¶ 16 Furthermore, even if we were to accept Mrs. Henkel's self-serving definition, she readily admitted she had never been taught how to hypnotize someone. N.T., Evidentiary Hearing, Vol. I, at 71. Presumably, Mrs. Henkel was relying on her own definition of hypnotism when she gave this testimony. The trial court's objective approach and its reliance on expert witness Dr. King was proper; Mrs. Henkel's subjective approach and its reliance on bald assertions only invite supposition.

¶ 17 Appellant Henkel does not join in the argument advanced by Elias and Lischner. Rather, Henkel contends the trial court did not explicitly determine whether Mrs. Henkel was a credible witness to the ultimate issue and, as such, we must presume she was a credible witness. Henkel brief at 5, *citing Lin v. United States Dept. of Justice,* 153 Fed.Appx. 65 (3d Cir.2005) (unpublished Opinion). Appellant Lischner joins in Henkel's argument.

¶ 18 Henkel and Lischner's argument is frivolous. The trial court explicitly found Mrs. Henkel was not credible in asserting she had hypnotized Matthew. Addendum to Trial Court Opinion at 22 ("The fact finder does not believe that Diane Henkel's testimony was credible."). We need not consider this argument further.

¶ 19 Having disposed of appellants' challenges to the trial court's findings on remand, we now turn to an analysis of the issues remaining from appellants' original appeal. Appellant Elias filed a brief raising issues differing from those raised by appellants Henkel and Lischner's identical briefs. Henkel also filed notice in this Court of his intention to join in the arguments raised in the Elias appeal. We will, therefore, dispose of each set of issues raised separately. Before we reach the Elias/Henkel appeal, however, we will consider the following issue, which is common to all three appeals:

> Whether the trial court committed reversible error by (1) denying defendants' motion for a psychiatric examination of the Commonwealth's chief witness, Matthew Henkel, to challenge his competency after he claimed revived repressed memory; and, (2) denying defendants' motion for disclosure of medical records and/or names of treating physicians after witness Henkel claimed revived repressed memory in violation of the Due Process Clause of the Fourteenth Amendment and the Sixth Amendment

9. The phrase "father of hypnosis" is culled from the The New York Milton H. Erickson Society for Psychotherapy and Hypnosis informational website. *See* http://www.nyseph. org/whathypnosis.html (visited on October 1, 2007).

of the Constitution of the United States and Article 1, Section 9 of the Pennsylvania Constitution.

Elias brief at 3–4 (emphasis removed); *see also* Henkel brief at 4, *accord* Lischner brief at 4.[10]

¶ 20 Our standard of review over evidentiary rulings requires us to determine whether the trial court abused its discretion. *Commonwealth v. Miller*, 897 A.2d 1281, 1286 (Pa.Super.2006), *citing Commonwealth v. Dengler*, 586 Pa. 54, 890 A.2d 372, 379 (2005). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id.*

¶ 21 Appellants argue they properly raised a question concerning Matthew Henkel's competency as a witness and the trial court erred in denying a pretrial request to order Matthew to submit to a psychiatric examination, produce any psychiatric records he may have, and produce the names of providers with whom he had treated. Appellants contend this error impeded their ability to effectively impeach Matthew.

¶ 22 The question of witness competency is clearly within the purview of the trial court. *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225, 239 (1999), *writ of certiorari denied* 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000), *citing Commonwealth v. Counterman*, 553 Pa. 370, 719 A.2d 284 (1998). The operative assumption is that a witness is competent to testify and, as a result, the burden of proving incompetence rests with the challenger. *Id., citing Commonwealth v. Goldblum*, 498 Pa. 455, 447 A.2d 234, 239

(1982). This assumption is necessary to effectuate the fundamental policies underlying both the constitutional right to privacy and the statutory psychiatrist-patient privilege. *See generally*, Pa. Const. Art. 1, § 1, **Inherent rights of mankind;** *see also* 42 Pa.C.S.A. § 5944, **Confidential communications to psychiatrists and licensed psychologists.**

¶ 23 A witness is competent when he or she: 1) was able to perceive an event with a reasonable degree of accuracy; 2) is able to remember the event; 3) is able to communicate about the event intelligibly; and, 4) is mindful of the duty to tell the truth under oath. *Koehler, supra* at 239, *citing Goldblum, supra* at 239. The trial court does not have the duty to order *any* investigation into a witness' competency unless the court has some doubt after observing the witness. *Id., citing Counterman, supra* at 295. An *en banc* decision of this Court holds that a psychiatric examination should not be ordered unless the proponent of such an examination demonstrates a "compelling reason for the examination." *Commonwealth v. Alston*, 864 A.2d 539, 549 (Pa.Super.2004) *(en banc), citing In re: T.R.*, 557 Pa. 99, 731 A.2d 1276 (1999); *In the Matter of K.D.*, 744 A.2d 760 (Pa.Super.1999); *cf. Commonwealth v. Garcia*, 478 Pa. 406, 387 A.2d 46, 55 (1978) (plurality) ("The court also has discretion as to whether it will order a psychiatric examination of a witness but should not do so without a need for it being shown.") (citation omitted).

¶ 24 During a pre-trial motions hearing, appellant Henkel's counsel asserted Matthew Henkel was potentially suffering from depression and that "a depressant is very similar to a person who has Alzheim-

10. Henkel and Lischner phrase the issue as follows: "Whether the trial court erred in not permitting a psychiatric examination of Matthew Henkel."

er's disease." N.T., Pre–Trial Motions Hearing, 9/29/03, at 58; *see also* Elias brief at 19. According to appellants, Matthew had been "under the guise of proper medical care ... and receiving antidepressant medicine" and "as a result of all of this, his memory in fact has become enhanced." *Id.* at 57. In his responsive brief to the trial court's addendum, Elias argues that testimony given during the recently conducted evidentiary hearing established Matthew had been hospitalized in a mental institution three months prior to the commencement of trial and that this newly discovered information lends further credence to appellants' overall position relative to this issue. Lischner joins the argument set forth in the Elias reply brief.

¶ 25 The trial court, after observing Matthew for a lengthy period of time, had no doubt as to his competency. Trial Court Opinion at 21; *see also Koehler, supra* at 239. At trial, Matthew stated that additional memories of the events leading up to Jones' death were triggered by the vibrations of a grated bridge over which he was traveling, which apparently sounded like the grating of the bridge over which Matthew and Elias dumped Jones' body. Trial Court Opinion at 21.

¶ 26 In denying the psychiatric examination and the records request, the trial court concluded appellants' complaints spoke to Matthew's credibility and not his competency because the thrust of the complaint was that Matthew's story became more detailed as time went on. Trial Court Opinion at 21–22. The trial court did not find Matthew's refreshed recollection raised an issue about his competency; it noted that witness recollections often improve when triggered by external stimuli and further noted it was not unusual for witnesses who are cooperating with law enforcement to be hesitant initially in disclosing all of the information they possess. *Id.* at 22.

¶ 27 The trial court had no doubts as to Matthew's competency at the time of trial and, hence, was under no duty to order any form of mental health investigation. *Koehler, supra* at 239, *citing Counterman, supra* at 295. The only way we could disturb the trial court's ruling in this situation is if the trial transcripts gave an unequivocal indication Matthew was incompetent. *See Miller, supra* at 1286. They do not.

¶ 28 In addition, appellants' attempt to equate depression with Alzheimer's disease is preposterous and troubling. Were we to sanction court-ordered psychiatric examinations every time a question is raised as to a witness' mental health treatment based on such flawed analogies, we would not only open the door to unwarranted invasions of privacy but we would also give witnesses reason to refuse or resist testifying anytime they previously had sought treatment for garden variety mental health issues.

¶ 29 Furthermore, while we recognize testimony at the evidentiary hearing suggested Matthew was indeed hospitalized for mental health problems three months prior to the murder trial, Elias does not point to any evidence tending to show this hospitalization impaired Matthew's ability to perceive the events leading up to Jones' murder, interfered with his ability to recall these events, rendered him unable to communicate what he perceived, or destroyed his ability to appreciate the import of giving testimony. *See Koehler, supra* at 239. Elias' argument makes it clear he is attacking Matthews' credibility—not his cognitive ability. *See* Elias supplemental brief at 28–29 ("Matthew Henkel, the immunized witness who participated in the homicide. Matthew Henkel, who suffers from mental illness and was suicidal before

the trial. Matthew Henkel, who unbeknownst to the jury, was in a psychiatric hospital a mere three months before the trial. Matthew Henkel, perjurer."). Elias already was given an opportunity to impeach the credibility of Matthew; he failed in this endeavor.

¶ 30 We conclude the trial court did not abuse its discretion in denying appellants' request for a psychiatric examination. *Miller, supra* at 1286. We have no reason to disturb the court's observations about Matthew Henkel's ability to testify and appellants' attempt to equate depression with Alzheimer's does not, in and of itself, raise a question about Matthew's competency. The argument Elias advances in his reply brief, which is joined by Lischner, fails because it is nothing more than an attack on Matthew's credibility—not his competence. Appellants were able to extensively cross-examine Matthew about the allegedly disparate stories he gave to investigators. The jury did not find Matthew's credibility was undermined during cross-examination. To afford appellants a new trial wherein Matthew can be further impeached through the use of irrelevant psychiatric records would result in a witch-hunt. *Koehler, supra* at 239.

¶ 31 We will now consider the issues raised in the Elias appeal and joined by appellant Henkel.

*Commonwealth v. Elias*, No. 1074 WDA 2004

¶ 32 In addition to the hypnotism issue and the challenge to the trial court's treatment of the issue surrounding Matthew's competency to testify, issues which already have been considered, Elias raises the following issues for our review:

> I. Whether the trial court committed reversible error by limiting the purpose to impeachment of testimony of defense witnesses that Matthew Henkel confessed to the murder of and had motive to kill the victim and prohibiting use of the testimony as substantive evidence of third party guilt thereby denying defendant Due Process of Law as guaranteed by the Fourteenth Amendment of the Constitution of the United States.
>
> II. Whether the trial court abused its discretion by allowing testimony regarding prior bad acts of the defendant in violation of Due Process of Law as guaranteed by the Fourteenth Amendment, Article I, Section 9 of the Pennsylvania Constitution and Rule 404(b) of the Pennsylvania Rules of Evidence where the evidence does not meet a recognized exception and where the probative value of the evidence did not outweigh its potential for prejudice.

Appellant's brief at 3–4.

¶ 33 Both of Elias' issues are framed as challenges to evidentiary rulings made by the trial court. We reiterate, our standard of review over such rulings is for an abuse of discretion. *Miller, supra* at 1286.

¶ 34 Elias and Henkel argue the trial court violated their Fourteenth Amendment Due Process rights by refusing to admit Matthew Henkel's alleged confession to his father—Bruce Henkel, Sr.—as substantive evidence and not merely for purposes of impeachment. Elias brief at 47, *citing Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

¶ 35 The general rule is that a prior inconsistent statement of a declarant is admissible to impeach the declarant. *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66, 68 (1986). Prior inconsistent statements also can be admitted as substantive evidence provided the declarant testifies at trial and is subject to cross-examination concerning the statement and one of the following is true: 1) the prior inconsistent statement was given under

oath subject to the penalty of perjury at a trial, hearing, deposition, or other proceeding; 2) the prior inconsistent statement is contained within a signed writing adopted by the declarant; and/or, 3) the rendition of the statement offered is a verbatim contemporaneous recording of an oral statement. *Commonwealth v. Chmiel,* 558 Pa. 478, 738 A.2d 406, 419 (1999), *writ of certiorari denied* 528 U.S. 1131, 120 S.Ct. 970, 145 L.Ed.2d 841 (2000), *citing Commonwealth v. Lively,* 530 Pa. 464, 610 A.2d 7, 8 (1992); *cf., Brady, supra* at 67; *see also* Pa.R.Evid. 803.1, **Hearsay exceptions; testimony of declarant unnecessary, (1) Inconsistent statement of witness.**

¶ 36 Elias and Henkel contend the rules governing the admission of prior inconsistent statements were developed "as a shield for the accused to protect against unreliable hearsay leading to unjust convictions" and that applying these rules as a "sword" against them as the accused frustrates due process. Elias brief at 50. In essence, Elias and Henkel contend Rule 803.1 violates the United States Constitution if it is applied to exclude the admission of a prior inconsistent statement for its substantive value when the statement is offered to impeach a prosecution witness by inculpating the witness. *See id.* at 47, 49–50.

 ¶ 37 The Due Process Clause of the Fourteenth Amendment guarantees a defendant "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina,* 547 U.S. 319, 324, 126 S.Ct. 1727, 1731, 164 L.Ed.2d 503, 509 (2006), *quoting Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) (additional citation omitted). State and federal lawmakers do, however, have broad latitude under the United States Constitution to establish rules excluding evidence from criminal trials.

*Holmes,* 547 U.S. at 324, 126 S.Ct. at 1731, 164 L.Ed.2d at 508. This latitude is abridged when the evidentiary rule under consideration "infringe[s] upon a weighty interest of the accused" and the rule is "arbitrary" or "disproportionate to the purposes [it is] designed to serve." *Id.,* 547 U.S. at 324, 126 S.Ct. at 1731, 164 L.Ed.2d at 509, *citing United States v. Scheffer,* 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413, 418 (1998) (additional citation omitted).

¶ 38 Pennsylvania Rule of Evidence 803.1 is patterned from Federal Rule of Evidence 801, **Definitions, (d)(1)(A) Statements which are not hearsay.** Pa. R.Evid. 803.1, *Comments.* Rule 803.1, however, allows for prior inconsistent statements to be admitted for substantive purposes under a range of circumstances *broader* than those outlined in Federal Rule 801. *See* Pa.R.Evid. 803.1, *cf.* F.R.E. 801(d)(1)(A). The Federal Rules are promulgated by the United States Supreme Court. Inasmuch as Elias and Henkel challenge the application of Rule 803.1 under the United States Constitution, we need not hesitate in deferring to the United States Supreme Court's judgment that Rule 801, and by necessary implication Rule 803.1, is constitutional under the Due Process Clause.

¶ 39 With regard to the matter *sub judice,* the trial court properly excluded the prior inconsistent statement offered against Matthew after concluding the alleged hearsay confession did not have sufficient guarantees of trustworthiness pursuant to Rule 803.1. Elias and Henkel do not allege Matthew's alleged confession was given under oath at a prior proceeding, was reduced to a signed writing that was adopted by Matthew, or was contemporaneously recorded. Pa.R.Evid. 803.1(1). Appellants were given the opportunity to impeach Matthew with the

use of the prior inconsistent statement. *See contra, Chambers, supra* at 293–294, 93 S.Ct. 1038. Such an opportunity was all that was required under the Fourteenth Amendment and Rule 803.1.

¶ 40 Furthermore, admitting Matthew's alleged confession for substantive purposes would have had no affect on the outcome of this case. *See generally, Commonwealth v. Schoff,* 911 A.2d 147, 157–158 (Pa.Super.2006) (noting that the harmless error doctrine applies when the Commonwealth can demonstrate the error complained of did not prejudice the defendant) (citation omitted). For the confession to have had any impeachment value, the jury would have had to believe the confession was given and was true. The jury's verdict makes it clear it did not harbor such a belief. If the jury did not believe the confession was given and the confession was true, admitting the confession for substantive purposes would have been of little value to the defense. The trial court did not abuse its discretion in admitting Matthew's alleged confession for impeachment purposes only. *Miller, supra* at 1286.

¶ 41 Elias and Henkel's final argument is that the trial court disregarded Pa.R.Evid. 404, **Character evidence not admissible to prove conduct; exceptions; other crimes,** (b) **Other crimes, wrongs, or acts,** and violated their rights under the Pennsylvania and Federal Constitutions by admitting evidence of prior bad acts for the purpose of allowing the prosecution to prove conformity therewith. Specifically, Elias and Henkel contend the trial court's admission of testimony from a witness tending to show Elias had "robbed some kids for weed" and that Elias had beaten up a person whom he suspected of robbing another drug dealing acquaintance's home unduly prejudiced the jury. Elias brief at 52.

¶ 42 Generally, evidence of an accused's commission of other crimes, wrongs, or acts is inadmissible to prove action in conformity therewith. Pa. R.Evid. 404(b)(1). Such evidence is admissible, however, when it is offered for other purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident" provided the trial court concludes the "probative value of the evidence outweighs its potential for prejudice." *Id.* at §§ (b)(2),(3) (emphasis added). When prior bad act evidence is admitted against a defendant to prove something aside from action in conformity therewith, the defendant is entitled to an appropriate limiting instruction. *Commonwealth v. Hutchinson,* 571 Pa. 45, 811 A.2d 556, 561 (2002), citing *Commonwealth v. Billa,* 521 Pa. 168, 555 A.2d 835, 842 (1989).

¶ 43 The trial court *sua sponte* issued the following instruction after a prosecution witness inadvertently offered testimonial evidence of Elias' prior bad acts:

Ladies and gentlemen, as you recognize from the opening statements, you are going to hear evidence that the parties involved here were perhaps involved in drug traffic that, of course, are criminal acts involving all of them. But the defendants here on trial are not here on trial for those acts. This evidence is offered for a proper reason, and that is to give you the context in which these events occurred and may provide certain things such as motive or opportunity or other things which I will explain to you ultimately. But the evidence is presented to you for that limited purpose.

This evidence may not be considered by you for any other way other than the limited purpose. You must not consider evidence of drug trafficking among the parties here to show that any of the defendants are persons of bad character

or criminal tendencies by which you might be inclined that they are guilty of crimes for which they are charged with here.

N.T., 10/14/03, at 109–110.

¶ 44 This instruction was neither the result of a defense objection nor the result of a defense request. N.T., 10/14/03, at 109. Appellant Elias did not file a motion in *limine* seeking to exclude evidence of his prior bad acts and he does not allege he was unfairly surprised by the introduction of this evidence. *See* Pa.R.Evid. 404(b)(4) ("In criminal cases, the prosecution shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such [prior bad act] evidence it intends to introduce at trial."). He did not object to the admission of prior bad act evidence in his omnibus pre-trial motion for relief. Elias Record, No. 16. Elias did not object to a single question that resulted in the admission of prior bad act evidence unfavorable to himself or his co-defendants on Rule 404(b) grounds. N.T., 10/16/03, at 485, 489–494; N.T., 10/18/03, at 906–907, 910, 915, 941–943. The certified record does not contain a proposed set of jury instructions drafted by Elias. Elias did not request a subsequent and additional limiting charge to the jury after closing arguments. He did not object to the trial court's actual jury charge and he did not object to the admission of the prior bad act evidence in his motion for post-trial relief. Elias Record, No. 42. Elias simply never objected to the admission of prior bad act evidence.

The issue is waived. *See Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 740 (2004), *citing Commonwealth v. Burkholder*, 528 Pa. 119, 595 A.2d 59 (1991) (failure to raise contemporaneous objection to evidence at trial waives claim on appeal).[11]

¶ 45 Even if we were to find the issue justiciable, the trial court dealt with the evidence complained of in an appropriate manner. The court admitted the evidence, *sans* objection, to prove Elias' interest in drug trafficking was sufficient to motivate him to commit violent acts. Trial Court Opinion at 30; *see also* Pa.R.Evid. 404(b)(2). The trial court issued an appropriate limiting instruction *sua sponte. Hutchinson, supra* at 561. No abuse of discretion has occurred.

*Commonwealth v. Henkel*, 1059 WDA 2004; *Commonwealth v. Lischner*, 1067 WDA 2004.

¶ 46 Henkel and Lischner raise the following issues for our review:

1. Whether the trial court erred in failing to grant [Henkel and Lischner's] motions for judgment of acquittal where the evidence was insufficient to sustain a verdict of guilt on Second Degree Murder.

2. Whether the trial court erred in failing to grant Defendant[s'] Post Sentence Motions.

3. Whether the trial court erred in imposing a life sentence which under the facts of the case constitutes cruel and unusual punishment.

Henkel brief at 4, *accord* Lischner brief at 4.[12]

11. Henkel, as noted above, joined the issues raised in the Elias appeal. As such, his challenge to the admission of prior bad act evidence fails with Elias' as a review of the certified record indicates Henkel also did not object to inclusion of the prior bad act evidence in a timely manner. In any event, Henkel would not have been prejudiced by

the admission of prior bad act evidence against Elias.

12. We have, once again, renumbered appellants' issues to reflect the trial court's disposition of the hypnotism issue on remand. We have also reordered the issues raised by the

¶ 47 Henkel and Lischner first argue the evidence was insufficient to sustain their convictions for second-degree murder. They contend this is so because the evidence demonstrated they renounced their role in the underlying criminal conspiracy. *See generally,* 18 Pa.C.S.A. § 903, **Criminal conspiracy, (f) Renunciation.**

¶ 48 The argument suffers from a fatal flaw. Conspiracy is not one of the enumerated felonies that can form the precursor for a felony murder conviction. *See* 18 Pa.C.S.A. § 2502, **Murder, (d) Definitions.** Henkel and Lischner's felony murder convictions stemmed from their convictions for robbery and kidnapping—not their conspiracy convictions. *Id.* Accordingly, reversal of Henkel and Lischner's conspiracy convictions would have no effect on their felony murder convictions.

¶ 49 Even if we were able to gloss over this flaw, Henkel and Lischner's challenge to the sufficiency of the evidence underlying their felony murder convictions is without merit. We reiterate that in reviewing a challenge to the sufficiency of the evidence, our standard of review requires us to examine all of the evidence, together with any reasonable inferences drawn therefrom, in a light most favorable to the Commonwealth as verdict winner. *Crabill, supra* at 490. Our scope of review requires us to examine all of the evidence presented. *Segida, supra* at 841. In employing our scope of review, the finder of fact is free to believe all, part, or none of the evidence presented in judging the credibility of the witnesses and the weight to be afforded the evidence produced. *Id.*

¶ 50 Section 903(f) absolves an actor for conspiratorial liability when the defendant can prove he "thwarted the success of the conspiracy" under circumstances demonstrating "a complete and voluntary renunciation of his criminal intent." We are unable to understand how Henkel and Lischner acted to "thwart the success of the conspiracy" given the fact that Jones was murdered and his body dumped in the river.

¶ 51 The second issue Henkel and Lischner raise, which alleges the trial court erred in failing to grant their post sentence motions, is nothing more than a condensed version of the first issue. Having already disposed of the renunciation issue, we will not reconsider it simply because it is raised under a new heading.

¶ 52 Henkel and Lischner's final contention is that imposition of a life sentence for second-degree murder is "cruel and unusual punishment" under both the United States and Pennsylvania Constitutions.[13] In essence, Henkel and Lischner contend it is unconstitutional for the General Assembly to grant trial courts the discretion to sentence a first-degree and second-degree murderer to the same sentence—in this case, life imprisonment.[14]

¶ 53 Nearly 25 years ago, in *Commonwealth v. Middleton,* 320 Pa.Super. 533, 467 A.2d 841 (1983), this Court dismissed a constitutional challenge identical to the one presented by Henkel and Lischner and stated:

> The offense of felony-murder is undoubtedly one of the gravest and most serious which can be committed. The taking of a life during the commission of an enumerated felony demonstrates a disregard for the property, safety, sanctity, integrity, and especially, the life of

Henkel/Lischner appeal for ease of disposition.

**13.** *See* Pa. Const., Art. I, § 13; U.S. Const. amend. VIII.

**14.** Henkel and Lischner's constitutional challenge implicates the legality of their sentences. *See Commonwealth v. Middleton,* 320 Pa.Super. 533, 467 A.2d 841, 846 n. 5 (1983).

the victim. It is a crime of archviolence. Clearly, such an offense merits a severe penalty.

*Id.* at 847. Henkel and Lischner give us no reason to revisit this precedent aside from a bald allegation that their sentences "seem to constitute cruel and unusual punishment" and are "*arguably* disproportionate." Henkel brief at 35, accord Lischner brief at 38 (emphasis added).

## Conclusion

¶ 54 Appellants have failed to demonstrate the trial court committed reversible error. The recurring theme underlying the vast majority of appellants' challenges is that Matthew Henkel was not a credible witness. The jury and the trial court, the ultimate arbiters of witness credibility in our judicial system, concluded otherwise. Matthew Henkel was cross-examined by three defense attorneys, none of whom, either individually or as part of the collective whole, were able to successfully impeach Matthew's credibility. We do not hesitate to affirm the judgment of sentence imposed on each appellant.

¶ 55 Judgments of sentence affirmed.