J-S35029-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| STEPHEN CAMMANN | |
| Appellant | No. 2220 EDA 2019 |

Appeal from the Judgment of Sentence Entered July 2, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0007271-2018

BEFORE:  BOWES, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                  Filed: November 19, 2020

Appellant, Stephen Cammann, appeals from the July 2, 2019 judgment of sentence imposing 11½ to 23 months of house arrest for recklessly endangering another person[1] ("REAP").  We affirm.

The trial court, sitting as factfinder, recited the pertinent facts in its Pa.R.A.P. 1925(a) opinion:

> At trial, the Commonwealth first presented the testimony of complainant, Kenyatta Brown.  Mr. Brown testified that, on June 21, 2018 between 8:30 and 9:00 p.m., he was at his grandmother's house at 21st and Carpenter Streets in Philadelphia, engaged in an argument with his girlfriend, Tanaiyah Dennis.  Mr. Brown and Ms. Dennis were having an argument over the fact that he had left her inside his grandmother's house, while Mr. Brown was out and about with his friends.  As Mr. Brown

---

[*] Retired Senior Judge assigned to the Superior Court.

[1]  18 Pa.C.S.A. § 2705.

described it: 'When I came back to the house, she tried to leave. And I didn't want her to leave. So we got in an argument.' Ms. Dennis left the house, and Mr. Brown followed her outside, where they argued for 10 minutes. Ms. Dennis then started walking southbound on 21st Street toward Kimball, and Mr. Brown pursued her; the couple continued to argue, stopping in front of 2101 Kimball Street, where they encountered Appellant and his girlfriend, Dr. Laura Nalbandian, who were installing a wooden gate on the side of Dr. Nalbadian's residence.

Dr. Nalbandian asked Ms. Dennis if 'everything [was] allright?' Mr. Brown responded, 'This is my girlfriend. Mind your business.' Mr. Brown testified that Appellant, who was holding a hammer, then asked Ms. Dennis if she was okay and grabbed her wrist. Mr. Brown grabbed hold of Ms. Dennis' other wrist and started walking back toward his grandmother's house, at which time he was struck in the side of the head and fell to the ground. Mr. Brown testified that the next thing he knew, he woke up in Thomas Jefferson University Hospital ("TJUH") with a skull fracture. He spent several days recovering in the hospital, and at the time of trial, still had a scar on his head.

The Commonwealth also introduced stipulated evidence that, if called to the stand, the records custodian or TJUH would testify that Mr. Brown was treated at TJUH for a left parietal depressed skull fracture as a result of being hit in the head with a hammer. He was admitted to the hospital on June 21 and discharged on June 24, 2018.

Trial Court Opinion, 12/17/19, at 2-3.

Appellant and Dr. Nalbandian offered a different account of the altercation, wherein Mr. Brown pushed Appellant into a wall and reached for a shiny object in his pocket. *Id.* at 3. Appellant therefore claimed he acted in self-defense. At the conclusion of trial, the trial court found Appellant not

guilty of aggravated assault[2] and possessing an instrument of crime,[3] but guilty of REAP. The court imposed sentence as set forth above, and this timely appeal followed.

Appellant raises a single assertion of error:

> Where the lower court acquitted Appellant of aggravated assault, simple assault, and possessing an instrument of crime, specifically finding that the Commonwealth failed to disprove his justification defense beyond a reasonable doubt, was the evidence insufficient to support the guilty verdict for recklessly endangering another person?

Appellant's Brief at 5.

"The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). A person may not use deadly force unless he believes it is necessary to protect himself against "death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat[.]" 18 Pa.C.S.A. § 505(b)(2).

> Where an accused raises the defense of self-defense under Section 505 of the Pennsylvania Crimes Code, the burden is on the Commonwealth to prove beyond a reasonable doubt that the defendant's act was not justifiable self-defense. The Commonwealth sustains this burden if it establishes at least one of the following: 1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; or 2) the accused provoked or continued the use of force; or 3) the accused had a duty to retreat and the retreat was possible with complete

---

[2] 18 Pa.C.S.A. § 2702.

[3] 18 Pa.C.S.A. § 907.

safety. It remains the province of the jury to determine whether the accused's belief was reasonable, whether he was free of provocation, and whether he had no duty to retreat.

*Commonwealth v. McClendon*, 874 A.2d 1223, 1229–30 (Pa. Super. 2005) (internal citations and quotation marks omitted). Section 505(b)(2)(ii) imposes a duty to retreat rather than resorting to deadly force, so long as the actor knows he can do so with complete safety, though the actor is not required to retreat from his dwelling.

Appellant relies on *Commonwealth v. Fowlin*, 710 A.2d 1130 (Pa. 1998), in which this Court wrote that "the defender may not be simultaneously found to have justifiably acted in self-defense and be criminally liable for crimes involving recklessness or malice." *Id.* at 1132. Similarly, in *Commonwealth v. Hilbert*, 382 A.2d 724 (Pa. 1978), our Supreme Court wrote that a claim of self-defense, if believed, negates "any element of […] recklessness of consequences." *Id.* at 731. Based on *Fowlin* and *Hilbert*, Appellant claims that the trial court could not convict him of REAP after accepting his justification defense as to the other crimes.

We disagree, because Appellant's argument rests on a mischaracterization of the record. Nowhere did the trial court specifically find that the Commonwealth failed to disprove Appellant's justification defense. On the contrary, the trial transcript reflects the following:

Clearly, this was a very difficult, very difficult, situation and difficult decision. **I found it certainly disingenuous when it seems so impossible for you or your girlfriend to admit you hit him in the head with a hammer and somehow you try**

**and make it like you punched him. That was, honestly, so disingenuous.** And for what type of smart reason you thought that was the appropriate response, you could not be more mistaken.

This is a court of law. This is not a place where you come and manipulate words to your advantage. This is where you come and you tell the truth. [The victim's mother] is entirely right. **This was a situation that, once it escalated, you needed to walk away, get on your cell phone, call 911.** To hit a man in the head with a hammer is to use deadly force.

*The burden on the Commonwealth is very high here to prove or disprove that you were justified in doing so. There were inconsistencies in the testimony. Do not think for one moment that your response to the situation was appropriate. It was not.*

*It may have reached a legal standard that is very difficult to overcome.* That is very different than what you do in a real-life situation when someone is smaller than you, clearly, and you have a hammer in your hand. I am speaking now. It is time you listen up. **There were other actions you could have taken, clearly, to diffuse the situation.**

N.T. Trial, 7/2/19, at 87-88 (emphases added).

Appellant quotes the italicized portion of the quoted language. Appellant's Brief at 12. From the italicized language, Appellant draws the conclusion that the trial court found that the Commonwealth failed to disprove his justification defense beyond a reasonable doubt. Appellant's conclusion is incorrect. The remainder of the quoted language, particularly the bolded sentences, makes clear that the trial court did not credit some of the testimony of Appellant and his girlfriend. Furthermore, the trial court found that Appellant used deadly force, had an opportunity to retreat, and failed to do so. Appellant's brief does not address any of these findings.

Based on the foregoing, we find nothing in the record to support Appellant's claim that the trial court acquitted him of aggravated assault and possessing an instrument of crime based on his justification defense. Accordingly, **Fowlin** and **Hilbert** pose no bar to his conviction for REAP. Subject to these observations, we affirm Appellant's conviction based on the trial court opinion, which accurately addresses the sufficiency of the evidence[4] in support of Appellant's REAP[5] conviction.  We direct that a copy of the trial court's December 17, 2019 opinion be filed along with this memorandum.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/20

---

[4] "In reviewing a challenge to the sufficiency of the evidence, our standard of review requires us to examine all of the evidence admitted at the hearing, together with any reasonable inferences drawn therefrom, in the light most favorable to the party whose position is bolstered by the trial court's findings." **Commonwealth. v. Henkel**, 938 A.2d 433, 438 (Pa. Super. 2007), **appeal denied**, 955 A.2d 356 (Pa. 2008).

[5] "A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury."  18 Pa.C.S.A. § 2705.

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : CP-51-CR-0007271-2018

:

:

VS. :

:

:

:

STEPHEN CAMMANN : 2220 EDA 2019

## OPINION

SCHULMAN, S.I., J.

Stephen Cammann ("Appellant") has appealed the Court's judgment of conviction and sentence. The Court submits the following Opinion in accordance with the requirements of Pa.R.A.P. 1925, and for the reasons set forth herein, recommends that its judgment be affirmed.

## I. PROCEDURAL HISTORY

On July 2, 2019, following a bench trial before this Court, Appellant was convicted of recklessly endangering another person ("REAP").[1] On the same date, upon considering all the relevant facts and circumstances of this case, the Court sentenced Appellant to 11½ to 23 months' incarceration.

On July 31, 2019, Appellant filed a Notice of Appeal in the Superior Court. On September 18, 2019, the Court ordered Appellant to file a Concise Statement of Matters Complained of on Appeal in accord with Pa.R.A.P. 1925(b), and on October 8, 2019, counsel for Appellant timely complied.

---

[1] Appellant was acquitted of aggravated assault, possessing an instrument of crime ("PIC") and simple assault.

## II. FACTUAL HISTORY

At trial, the Commonwealth first presented the testimony of the complainant, Kenyatta Brown. Mr. Brown testified that, on June 21, 2018 between 8:30 and 9:00 p.m., he was at his grandmother's house at 21st and Carpenter Streets in Philadelphia, engaged in an argument with his girlfriend, Tanaiyah Dennis. Mr. Brown and Ms. Dennis were having an argument over the fact that he had left her inside his grandmother's house, while Mr. Brown was out and about with his friends. As Mr. Brown described it: "When I came back in the house, she tried to leave. And I didn't want her to leave. So we got in an argument." Ms. Dennis left the house, and Mr. Brown followed her outside, where they argued for 10 minutes. Ms. Dennis then starting walking southbound on 21st Street toward Kimball, and Mr. Brown pursued her; the couple continued to argue, stopping in front of 2101 Kimball Street, where they encountered Appellant and his girlfriend, Dr. Laura Nalbandian, who were installing a wooden gate on the side of Dr. Nalbandian's residence. (See N.T. 07/02/19 at 13-18).

Dr. Nalbandian asked Ms. Dennis if "everything [was] all right"? Mr. Brown responded, "This is my girlfriend. Mind your business." Mr. Brown testified that Appellant, who was holding a hammer, then asked Ms. Dennis if she was okay and grabbed her wrist. Mr. Brown grabbed hold of Ms. Dennis' other wrist and started walking back toward his grandmother's house, at which time he was struck in the side of the head and fell to the ground. Mr. Brown testified that the next thing he knew, he woke up in Thomas Jefferson University Hospital ("TJUH") with a skull fracture. He spent several days recovering in the hospital, and at the time of trial, still had a scar on his head. (See N.T. 07/02/19 at 16-23, 29).

The Commonwealth also introduced stipulated evidence that, if called to the stand, the records custodian for TJUH would testify that Mr. Brown was treated at TJUH for a left parietal

2

depressed skull fracture as a result of being hit in the head with a hammer. He was admitted to the hospital on June 21 and discharged on June 24, 2018. (See N.T. 07/02/19 at 32).[2]

For his case-in-chief, Appellant first presented the testimony of his girlfriend, Dr. Nalbandian. Dr. Nalbandian testified that, on June 21, 2018 at approximately 8:30 p.m., she was outside her residence at 2101 Kimball Street with Appellant, who was building and installing a gate on the side of the property. At that time and location, she observed Mr. Brown "dragging and shoving" Ms. Dennis, and holding her in a "bear hug". Dr. Nalbandian testified that Ms. Dennis exclaimed, "Let me go" as they turned the corner onto Kimball Street. Dr. Nalbandian rounded the corner of Kimball Street and observed Mr. Brown pinning Ms. Dennis against the wall and "knocking her around." (See N.T. 07/02/19 at 33-40).

At this point, Dr. Nalbandian and Appellant attempted to intervene. Words were exchanged between them and Mr. Brown. According to Dr. Nalbandian, Mr. Brown initiated threatening behavior toward her, and then toward Appellant. She described Mr. Brown as pushing Appellant into a wall and reaching his hand in and out of his pocket, where she saw a "shiny object" that looked to her like the handle of a pocketknife.

> …."And he was -- I was looking at his [Mr. Brown's] back.
> He was facing north on [the] 21st Street sidewalk. And as he
> turned to do this with his shoulders, Mr. Brown's shoulder was still
> in Steve's chest and holding him against the things. That is when
> Steve hit him with his right hand on the back of his head or neck.
>
> Q.      What was in his right hand?
>
> A.      A hammer was in his right hand. You can see it in
> the tool belt on that picture. And he had a drill in his other hand.
> He was using it to hang screws, and I was handing him screws.

3

Q: So in other words, he didn't draw this hammer from the tool belt?

A: No.

Q: It was in his hand when Br. Brown approached him?

A: Correct.

Q: Okay. What happened? Did you see Mr. Brown fall?

THE COURT: I am sorry. Are you saying he hit him with his hand or he hit him with the hammer?

A. He hit him with his fist and I am told the hammer is what connected with Mr. Brown's head.

THE COURT: You are told? You didn't see?

A. I saw him drop. I saw Mr. Brown drop.

THE COURT: That is not the question.

BY MR. PERRI:

Q: He had a hammer in his hand?

A: Yes.

Q: And he swung the hand with the hammer—

A: He was holding the handle.

\*        \*        \*

(N.T. 07/02/19 at 40-44).

4

On cross-examination, Dr. Nalbandian tried to further clarify whether she actually saw the Appellant hit Mr. Brown in the head with a hammer.

BY MS. LYNN

Q: Dr. Nalbandian, you said that you didn't actually see Stephen hit Mr. Brown in the head; is that correct?

A: No. I saw him hit him. I saw his arm swing and his arm hit him.

Q: Okay. In the side of the head?

A: No. Back of the head.

Q: And you are saying today that you didn't see a hammer in his hand?

A: I saw a hammer in his hand.

Q: But he didn't hit him with a hammer? He punched him was your testimony.

A: He used his fist and was holding the hammer in it. So if this is the handle of a hammer—

Q: So you are saying Mr. Cammann punched Mr. Brown in the head with a hammer essentially.

A: Sure, essentially.

        *        *        *

THE COURT: I would like to know very clearly, ma'am, one way or the other, did you see what contacted the defendant's ---what contacted the complaining witness' head? What contacted? Was it a fist or a hammer? Or did you not see?

Q: It was the hammer.

(N.T.7/2/19 pgs.46-49)

5

Dr. Nalbandian testified that, after Mr. Brown went down, Appellant called 9-1-1 and rendered aid to Mr. Brown while emergency responders were en route. A crowd of people began to assemble, at which time Dr. Nalbandian saw a teenager remove an "object" from Mr. Brown's right pocket. (See N.T. 07/02/19 at 44-45).

Finally, Appellant testified in his own defense. He testified that, on June 21, 2018, he was working on a gate outside Dr. Nalbandian's residence, when he heard two people arguing. When he looked up, he saw Mr. Brown and Ms. Dennis crossing 21ˢᵗ Street. "She was yelling at him. She kept saying, 'Stop. Let me go.' She had said 'Ouch,' a bunch of times." Appellant testified that he saw Mr. Brown repeatedly punching Ms. Brown in the ribs and saw her fall to the ground more than once -- but Mr. Brown continued to pick her up and drag her around in a bear hug. A neighbor across the street attempted to intervene, but "Mr. Brown ran him off. He got right in his face and [the neighbor] turned around and went back in the house." Thereafter, Ms. Dennis crossed the street and kept yelling, "Stop. Let me go", at which time Dr. Nalbandian stated, "Hey, buddy, if she wants you to let her go, you have to let her go." (See N.T. 07/02/19 at 51-54).

Appellant testified that after Dr. Nalbandian told Mr. Brown to "let her go", Mr. Brown became "enraged"; he ran Dr. Nalbandian up against the wall and shouted in her face. Dr. Nalbandian was "frozen" and did not say anything. At that point, Appellant stated, "Hey, chill the F' out." Mr. Brown then turned on Appellant and pushed him against the wall with his shoulder, stating, "What the F' you going to do? I will F' you up. I will F'ing kill you." Appellant replied, "Dude, calm down. Just calm down. There are cops on the street. Just calm down." Appellant testified that as he was saying this, Mr. Brown was reaching for the handle of "something" in his right pocket. When Mr. Brown reached for this object a second time,

6

Appellant struck him in the head with a hammer, immediately felling him to the ground. Appellant testified that after he struck Mr. Brown with the hammer, he dialed 9-1-1 and attempted to render aid until Mr. Brown's family members arrived and stopped him. (See N.T. 07/02/19 at 54-58).

In rebuttal, the Commonwealth called Ms. Dennis to the stand. Ms. Dennis testified that, on the evening of June 21, 2018, she got into an argument with her boyfriend, Mr. Brown, in the area of 21st and Kimball Streets. Ms. Dennis testified that, at the time, Mr. Brown was grabbing her wrists, pulling her toward his grandmother's house, and stating that he was "sorry." Dr. Nalbandian approached her and asked if she was okay. Ms. Dennis stated, "Yes. This is my boyfriend", and Mr. Brown told her to "mind her business". They continued to argue in front of Dr. Nalbandian, who "kept saying something", and Mr. Brown kept saying "mind your business." Ms. Dennis testified that while Mr. Brown was pulling her by the left arm, Appellant grabbed her right wrist, at which point Mr. Brown was struck and collapsed to the ground. (See N.T. 07/02/19 at 63-70).

On cross-examination, Ms. Dennis admitted that, shortly after the incident, she provided a statement to detectives indicating that Mr. Brown was not just holding her wrists but was holding her in a bear hug when they were arguing. Additionally, she admitted that after Dr. Nalbandian said to Mr. Brown, "You gotta let her go", Mr. Brown started waving his hands and yelling in her face. (See N.T. 07/02/19 at 71-75).

7

Based on the foregoing evidence, the Court found Appellant guilty of REAP, and not guilty of the remaining offenses. On the same date, the Court imposed sentence as previously set forth.[3] This appeal followed.

III. ISSUE ON APPEAL

Appellant sets forth the following issue in his Rule 1925(b) Statement:

1. The evidence at trial was insufficient to support Appellant's conviction for recklessly endangering another person. The Commonwealth failed to disprove Appellant's justification defense beyond a reasonable doubt, which resulted in an acquittal on every other charge.

(Appellant's Rule 1925(b) Statement, p. 1).

IV. DISCUSSION

1. Sufficiency of the Evidence Supporting Appellant's Convictions

Appellant contends that the evidence was insufficient to sustain his conviction for REAP. This claim fails.

A. Sufficiency Standard

In evaluating a challenge to the sufficiency of the evidence, a reviewing court must view the evidence in the light most favorable to the Commonwealth as verdict winner. It accepts as true all the evidence, direct and circumstantial, and all reasonable inferences arising therefrom upon which the finder of fact could properly have based its verdict, in determining whether the

[3] The Court originally ordered Appellant to serve his sentence on house arrest. (See N.T. 07/02/19 at 89-91). However, when Appellant subsequently appeared for house arrest processing at the Criminal Justice Center, he was found to be in possession of an eight-inch dagger. Appellant thereafter was brought before the Court, which revoked Appellant's house arrest and ordered him to serve his sentence in an institutional setting with work-release eligibility. (See N.T. 08/09/19 at 4-22). Appellant's sentence is not subject of this appeal.

8

evidence and inferences are sufficient to support the challenged conviction. Commonwealth v. Carroll, 507 A.2d 819, 820 (Pa. 1986); Commonwealth v. Griscavage, 517 A.2d 1256, 1259 (Pa. 1986); Commonwealth v. Hopkins, 747 A.2d 910, 913 (Pa. Super. 2000).

"[T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." Commonwealth v. Jones, 874 A.2d 108, 120 (Pa. Super. 2005); see Commonwealth v. Rippy, 732 A.2d 1216, 1218-1219 (Pa. Super. 1999) (while conviction must be based on more than mere speculation, "the Commonwealth need not establish guilt to a mathematical certainty"). **"Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances."** Commonwealth v. Hutchinson, 947 A.2d 800, 806 (Pa. Super. 2008) (emphasis in original); see also Commonwealth v. Sneddon, 738 A.2d 1026, 1027 (Pa. Super. 1999).

"The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." Commonwealth v. Jones, 874 A.2d at 120. Thus, the decision of the trier of fact will not be disturbed where there is support for the verdict in the record. Commonwealth v. Bachert, 453 A.2d 931, 935 (Pa. 1982). When assessing the sufficiency of the evidence, a reviewing court "may not weigh the evidence and substitute [its] judgment for that of the fact-finder." Commonwealth v. Vetrini, 734 A.2d 404, 407 (Pa. Super. 1999)

"Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered." Hutchinson, 947 A2d at 806. "Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." Id.

9

## B.    REAP

In order to sustain a conviction for REAP, the Commonwealth must prove that Appellant "'recklessly engage[d] in conduct which place[d] or may [have] placed another person in danger of death or serious bodily injury.'" Commonwealth v. Schmohl, 975 A.2d 1144, 1148 (Pa. Super. 2009) (quoting 18 Pa.C.S. § 2705). "A person acts recklessly if he or she 'consciously disregards a substantial and unjustifiable risk' of injury to others." Schmohl at 1148 (quoting 18 Pa.C.S. § 302(b)(3)).

## C.    Application

Applying the foregoing principles and considering the totality of the circumstances, the evidence established that Appellant acted recklessly in response to a verbal altercation that he initiated with Mr. Brown. There was no credible evidence that Mr. Brown was armed or presented a danger that would justify Appellant's violent attack. As noted by the Court, both Dr. Nalbandian's and Appellant's testimony lacked credibility. At sentencing, the Court explained that it found the defense witnesses to be "certainly disingenuous when it seems so impossible for you or your girlfriend to admit that you hit him in the head with a hammer and somehow try and make it like you punched him." (N.T. 7/2/19 pg.87). Furthermore, Dr. Nalbandian testified that Appellant hit Mr. Brown in the back of the head, while the parties stipulated that Mr. Brown suffered a left skull fracture. Nor was there any evidence that Mr. Brown was armed with a weapon, rather, there was only speculation by Appellant and his girlfriend that they saw an "object" in his pocket. The Appellant's claim of justification, therefore, was based neither upon credible testimony nor direct evidence. Thus, the Court found that Appellant's reaction in

10

violently swinging a hammer at a person's head was not appropriate under the circumstances; rather, "[t]his was a situation that, once it escalated, [Appellant] needed to walk away, get on [his] cell phone, call 911. To hit a man in the head with a hammer is to use deadly force." (See N.T. 07/02/19 at 88). Finding no justification for the attack, Appellant nonetheless applied deadly force not just against Mr. Brown, but also while holding Ms. Dennis by the wrist, placing her in danger of serious bodily injury as well. As such, the evidence was more than sufficient to establish the crime of REAP. Accordingly, Appellant's sufficiency claim fails.

## V.    CONCLUSION

Based on the reasons set forth in the foregoing Opinion, this Court's judgment of sentence should be affirmed.

BY THE COURT:

DATE: 12/17/19

SUSAN I. SCHULMAN, J.

11